[No. B164439. Second Dist., Div. Four. Jan. 7, 2004.]

OCEAN PARK ASSOCIATES, Plaintiff and Appellant, v.
SANTA MONICA RENT CONTROL BOARD, Defendant and Respondent.

COUNSEL

Law Offices of Rosario Perry and Rosario Perry for Plaintiff and Appellant.

Doris M. Ganga and Michaelyn Jones for Defendant and Appellant.

OPINION

CURRY, J.—Appellant Ocean Park Associates, Inc., seeks review of a trial court judgment that denied appellant's writ petition and upheld decisions made by the Santa Monica Rent Control Board (the Board) on (1) petitions for rent decreases submitted by certain tenants of appellant's apartment building and (2) a single petition filed by the Board administrator on behalf of all the tenants of the building. The adjustments were based on numerous construction projects that ultimately improved the building but left various common area facilities unavailable for long periods of time and caused considerable disruption and noise. Appellant contends that the decision of the Board represented an unconstitutional intrusion on judicial power; that the Board cannot base rent decreases on building defects that do not rise to the level of safety code violations; that the Board regulations at issue do not rationally advance the purposes of the governing ordinance, the Santa Monica Rent Control Charter Amendment (RCCA); that the Board exceeded its authority under the governing ordinance by filing on behalf of tenants who had not initiated a complaint on their own; and that the Board's decision was not supported by the evidence.

We agree that the Board does not have the power under the governing ordinance to file a petition or petitions to reduce rents on a unit-by-unit basis on behalf of individual tenants who have not come forward on their own initiative. At the same time, we conclude that its decisions pertaining to the tenant petitioners were authorized and supported by the evidence. We, therefore, affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties do not dispute certain basic facts. Appellant is the owner of a 43-unit apartment building located in Santa Monica. Rob Gabriel is its representative. Beginning in or about November 1997, appellant began an extensive series of construction projects aimed at improving the building's exterior and common areas. The work began with the remodel of unit

balconies in 1997. In 1998, remodel of the lobby, recreation room, mail room, sauna, and outdoor landscaping commenced along with a complete re-roofing and exterior painting.[1]

Tenants of the building and real parties Diana Hart, Julie Wagner, Jaime Nicolaisen, and Annie Libenson filed petitions for ordinary rent decreases on June 9, 1999, August 4, 1999, August 25, 1999, and September 1, 1999, respectively. Another tenant, Nancy Garber, filed a similar petition on October 25, 1999.[2]

Alerted to the construction by these early complaints and petitions, the Board sent a notice to Gabriel, dated October 15, 1999, and copied to all the tenants in the building. It stated that the Board had received information that the building was undergoing construction; that Board regulations allowed tenants to file rent decrease petitions for negative impacts and loss or reduction of housing services caused by such construction; that "[d]ecreases may be awarded for the entire time period that any qualifying construction impacts or impairments are in existence, beginning with the date of this notice"; and that "[t]enants are not required to give you additional notice of their intention to the file rent decrease petitions." The notice stated that appellant was "encouraged to talk with [the] tenants to resolve issues which arise due to the construction" and that the Board would "provide mediation services to assist you and your tenants in developing an agreement regarding mitigating the impacts of the construction." If the issues were not resolved in mediation "and decrease petition(s) are filed," hearings would be set in accordance with Santa Monica Rent Control Board regulation 4400.

Seven tenants, including the four who had already complained to the Board, felt sufficiently inconvenienced by the construction-caused noise, disruption, and loss of common area services to respond to the notice and file "Petition[s] for Construction Rent Decrease" (construction petitions). Specifically, real party Philip Lodwick filed a construction petition on November 17, 1999. Real party Nenad Kuraica filed a construction petition on December 15, 1999. Real party Bradley Yourist filed an ordinary rent decrease petition on December 29, 1999, and a construction petition on January 12, 2000.

---

[1] The hearing officer summarized the work as follows: "repair of all units' balconies; reroofing; exterior painting; remodel of lobby; new entrance doors; new mailroom off lobby with new mailboxes; partial remodel of stairwells; remodel of recreation room, sauna and showers; re-landscaping of front yard and modifications of front wall; remodel of back patio area, including jacuzzi; redesign of back entrance from alley; and addition of architectural or decorative elements such as fountains, sculptures and murals throughout the common areas."

[2] Garber entered into a settlement agreement with appellant in March 2000. Because Garber settled all her claims for rent decreases, including construction-related claims, she did not receive a decrease as a result of the underlying Board decision, and is not a party to this appeal.

Wagner, Hart, Libenson, and Nicolaisen, having already filed petitions for ordinary rent decrease, filed construction petitions on January 19, 2000, January 31, 2000, February 7, 2000, and April 11, 2000, respectively.

There was a hearing on Libenson's petition for ordinary rent decrease in December 1999 and January 2000. After hearing her testimony, the testimony of a Board inspector, and Gabriel's testimony, the hearing officer ordered a rent decrease of $335 per month due to a warped front door, a silverfish infestation, accumulation of debris in common areas, deteriorated carpet, deterioration of paint, defective elevator, defective light panels, incomplete construction in the laundry room, loss of security, and loss of recreational facilities. A hearing for Yourist's ordinary rent petition was held in March 2000. The hearing officer granted a $30 reduction in rent per month due to a broken window, a defective electrical outlet, and a damaged bathtub stopper. In addition, Wagner and Hart engaged in mediation with appellant, and reached settlements reducing their rent in August 1999. Nicolaisen entered into a settlement agreement through mediation in October 1999.

On March 1, 2000, the Board filed a "Petition for Common Area Construction Rent Decrease" purporting to act on behalf of all the tenants in the building.

*Regulation 4400*

The seven individual construction petitions and the Board's petition were filed under the authority of Santa Monica Rent Control Board regulation 4400 (hereafter, Regulation 4400 or the Regulation). The Regulation was adopted in 1999.[3] Its stated purpose is to "provide for decreases in rent to tenants of buildings undergoing substantial repairs, rehabilitation, and/or upgrades, for interference with the occupancy of their units, disruptions, and loss of housing services caused by the construction." It provides that "[r]ent decreases are authorized under this regulation if construction at the property significantly impacts the habitability of a unit, interferes with the tenant(s)' occupancy of their unit, or reduces or removes the housing services of a unit for a period exceeding twenty-four hours, except as provided in subdivision (ii) below. [¶] . . . [¶] (ii) No rent decrease is authorized under this regulation for unavoidable impacts or impairments caused by reasonably necessary repair or maintenance to existing amenities or housing services of a unit, if the impacts or impairments do not substantially interfere with the right to occupy the premises as a residence, except in the following circumstances:

---

[3] According to a staff memorandum, Regulation 4400 "was adopted in September 1999," and appellant's case was "the first hearing officer's decision [under the Regulation] to reach the Board on appeal."

(1) the repair or maintenance work is carried out in an unreasonable manner; or (2) the repair or maintenance work takes an unreasonably long time to complete."

The Regulation provides for receipt of notice by the landlord "that decreases may be awarded for the entire time-period that such impacts or impairments are in existence, from the date of the notice." If petitions are submitted "concerning conditions common to two or more units at a property, the Board Administrator may, when appropriate, file a petition for decrease placing at issue decreases for all affected units at the property for which no petition has previously been filed."

The decreases due to construction are to be "based upon the degree of impairment, degree of loss of housing service, and degree of interference with the occupancy of the unit caused by the construction." In addition, "[i]n determining the amount of the decreases, the impact on the tenant's normal use of his or her unit (e.g., whether the tenant works at home or remains at home during the day, tenants with children at home during the day, tenants' health conditions) shall be considered." The regulation provides a list of items (e.g., "[n]oise, vibrations . . . [o]dors, dust, ventilation . . . [s]afety, . . . significant debris, work done outside of permitted hours") and gives a range of decreases allowable for each measured as a percentage of rent. The ranges are from 10 to 50 percent or 10 to 75 percent for most items, but safety issues may result in a reduction of up to 100 percent. Other items listed, such as loss of parking, storage, security, laundry facilities, recreation facilities, patios, and elevator service could lead to reduction of rent by a specific dollar amount of between $5 and $120 depending on the item involved. Decreases are to be "determined from the later of the following times: (1) the date of notice of potential decreases provided pursuant to the subsection (c) above; or (2) the initial date of the onset of the condition for which decreases are awarded."

### Building Inspections

Board-employed inspectors visited the building at various times in December 1999 and January and February 2000. They observed cracks in the walls and window of two apartments; exposed electrical wires, patched walls, construction materials, dust, and debris in common areas; soiled carpets; open security gates; uncompleted work in the sauna, recreation room, and laundry room; noise, vibrations, and fumes from roof repairs and other work; improperly fitting door in one unit; Jacuzzi out of service; unplanted potted plants; silverfish in one unit; damaged carpet in one unit; cracked pavement in the front of the building; windows without glass in the stairwell; paper and plywood floor covering in the stairwell; disturbance of acoustic material that

could have contained asbestos; and a trough or indentation near the front entry. The residents reported garage thefts and water shut-offs not observed by the inspectors.

*Hearing on Construction Petitions*

Hearing on the seven individual construction petitions and the Board's petition on behalf of all the tenants was held in April and May 2000. The Board did not have an official legal representative at the hearing other than the hearing officer herself. Witnesses were questioned by the hearing officer directly or by the tenants or by the attorney who represented the landlord. All seven of the tenants who filed individual construction petitions appeared and testified. In addition, three other tenants appeared and two testified. One did not agree with the other tenants with respect to certain matters. The other was called by the landlord's attorney.

The first witness was one of the Board inspectors, Murray Harreschou. He testified about his February 2000 inspection. He estimated that painting the walls and work on the floor should have been completed in a matter of days. He believed that finishing the common areas could be done in two weeks with a "decent size" crew. He equivocated somewhat on the recreation room, stating that it could be done in three weeks, but that spending a year could be reasonable if done in conjunction with other work. With respect to the sauna, he thought it should have been done in one or two months. Redoing the landscaping should take two weeks. He could not know the time needed for roof replacement, exterior painting, or the lobby remodel, but gave an estimate of less than one month for the lobby if the work were organized and all the trades and materials were on hand.

Tenants who worked from home and lived close to construction areas reported significant problems with noise, fumes, dust, and vibrations, and work that kept going after 6:00 p.m. Tenants reported that projects would be started and then stopped before they were finished with attention redirected to another project. The tenants testified to few specifics concerning the timing of the construction. The painting reportedly took five to six months. Building a waterfall took about a year. The re-roofing was finished in 1999.

Two tenants reported they did not have a problem with the noise level. One of the two lived overlooking a busy street.

Gabriel testified that he was doing his best to provide a remodel that would last a long time and be attractive. His father acted as general contractor to coordinate work, although he is not a licensed contractor. At one time, he had to wait for availability of a particularly good tile installer to complete the

sauna. He denied using the construction to drive tenants out of the building. He attempted to mitigate the impact of the construction by consulting with tenants prior to beginning noisy work.

A day was set aside for appellant's contractors to testify, but they did not appear on that day. A Board inspector visited the premises in June, after the hearings ended, and reported that certain items were still not completed.

### Hearing Officer's Decision

The hearing officer denied reductions for the balcony work and painting, and concluded that the roofing had been completed in a reasonable time. She concluded that rent reductions were warranted in the following amounts for the following items for the following number of days: (1) excessive noise/10 percent/351 days (from October 15, 1999, through September 30, 2000); odors, dust and ventilation/5 percent/351 days (from October 15, 1999, through September 30, 2000); safety and security issues, including electrical hazards, fire hazards, and trip and slip hazards/10 percent/248 days (from October 15, 1999 through June 19, 2000); inadequate construction management, including excessive debris and unreasonable delays and work performed in an unreasonable manner/10 percent/351 days (from October 15, 1999, through September 30, 2000); loss or reduction of laundry facilities/$5 per month per unit/248 days (from October 15, 1999, through June 19, 2000); loss or reduction of recreational facilities/$30 per month per unit/351 days (from October 15, 1999, through September 30, 2000); and loss or reduction of exterior space and spa/$10 per month per unit/248 days (from October 15, 1999, through June 19, 2000). One tenant, Kuraica, also got a reduction for individual unit issues, including a defective patio door and damaged carpeting.

With respect to evidence to support the specific figures used for delay time or unreasonable lengthy construction time, the hearing officer stated that "[a]ll tenants who testified . . . asserted that the work took an unreasonably long time and was subject to unreasonable delays." The hearing officer admitted that Harreschou "was planning to review the testimony of the owner's contractors, including what was in the building before, the scope of work, the size of crews, the budget, and so forth, and then provide an opinion as to how long the entire job should reasonably have taken. However, the owners failed to present any testimony on the above subjects, nor did they submit any blueprints, plans, bids, contracts, permits or other documents which would have helped Mr. Harreschou reconstruct what work was done, how and by whom." The hearing officer concluded that this lack of evidence "undermined the owners' case" because "any doubts have to be resolved against them with respect to issues on which they failed to produce any evidence."

The hearing officer also relied on Harreschou's "rough time estimates." He estimated "the fastest a building this size could be painted would be ten days to two weeks; the lobby remodel could be done in less than one month if all the trades and materials were on hand and the work were properly organized; the rec room could be finished in three weeks, working as fast as possible; the sauna and bathroom work could be finished in one to two months; and the front landscaping could be done in about two weeks" and "it would be unreasonable for it to take a year to complete the sauna/bathroom area or the recreation room." The photographs taken by the various Board inspectors over a period of approximately six months further showed the "glacial pace" of the construction work.

As the opinion did not issue until August 2000, the decreases were to go into effect on September 1, 2000, and remain in effect for 11.7 months. The calculations resulted in substantial reductions for the units, ranging from $250 to over $300 per month. Hart, Nicolaisen, and Wagner received lesser decreases because of their prior settlements, and Libenson received a lesser decrease because of the prior hearing on her petition for ordinary rent decrease. Despite his prior petition and hearing, Yourist was given the full decrease because the hearing officer found that "none of the conditions for which a decrease was granted overlapped with any of the conditions raised in the instant construction decrease petitions."

*Appeal to the Board*

Appeal was taken to the Board. Appellant contended that rent decreases should not have been awarded to tenants who did not file individual petitions because the Board could not presume they had been inconvenienced. Appellant further argued that there was insufficient proof that the work was carried out in an unreasonable manner or took an unreasonably long time to complete. Appellant argued that the rent decreases were improperly awarded retroactively for construction prior to October 1, 1999; improperly based on a percentage of the rent; and improperly calculated on the higher rentals in effect in September 2000 rather than the rentals in effect in September 1999 when the bulk of the work was going on.

The Board's staff prepared a memorandum analyzing the appeal, agreeing with appellant that the rentals in effect in September 1999 should have been used to calculate the award but otherwise recommending that the hearing officer's decision be upheld. With respect to the grant of decreases to tenants who did not file petitions, staff stated that Regulation 4400 allows the Board to file a petition on behalf of tenants where existing petitions have raised issues affecting two or more units, and that appellant provided no legal authority making such petitions impermissible. Because the conditions at

issue "were of the kind that would tend to affect the property's units generally, such as noise, vibrations, odors and dust, construction materials left in common areas, and loss or reduction of access to common facilities" and the problems attested to by a relative handful of owners were "applicable to all units on the property," staff expressed the belief that the single, Board-initiated petition was valid. Staff did not agree with appellant that filing the rent decrease petition on behalf of the tenants turned the Board into an "advocate" or that the administrator who was responsible for filing the petition gave the Board advice about how to resolve the factual and legal issues.

Staff did agree that the hearing officer's findings on reasonableness had to be supported by substantial evidence, but believed that the findings were supported. In particular, the memorandum pointed to evidence that there were "long periods" during which work was suspended and left in an unfinished condition, that "the project involved many non-standard elements which are unusually demanding" but that Gabriel supervised the project himself rather than employing a general contractor. Moreover, "[a]ll petitioning tenants agreed that the project took too long," and "even Gabriel himself essentially conceded this in various letters to tenants." In addition, "the opinion of Murray Harreschou, the consulting contractor . . . indicated that the project could have been completed in much less time, notwithstanding the fact that it was performed with the building fully occupied."

With regard to the contention that basing decreases on percentage of (widely varying) amounts of monthly rent paid by each tenant, the memorandum stated, "This claim does not conform to any constitutional theory or judicial precedent known to legal staff" and that "staff is aware of no judicial authority requiring local agencies to equalize such rent adjustments." Therefore, the recommendation was to follow the percentage methodology set forth in the regulation. Staff denied that individualized rent decreases were the equivalent of awarding emotional distress damages to tenants. Instead they were "temporary rent adjustments, designed to compensate for impairment of the use of the premises and common area facilities."

Appellant protested the staff recommendations. In particular, appellant pointed out that the RCCA referred to petitions filed by "tenants" and "landlords," but said nothing about petitions filed by the Board or its administrator. Appellant further argued that RCCA section 1805(d)(14) provides that decisions decreasing rent are to remain in effect until the Board finds that the landlord has corrected the defect warranting the decrease. By permitting the award of decreases for conditions already corrected, appellant maintained, the Regulation conflicted with the RCCA. Appellant also took issue with staff's apparent belief that the tenants themselves were qualified to

render an opinion on whether or not the length of time it took to complete the various construction projects was reasonable.

Staff issued a supplemental memorandum. The memorandum conceded that "the [RCCA] does not state expressly that a regulation may provide for an administrator's petition where common area issues are raised" or " 'construction impact' decreases," but took the position that under "the well-established principle of implied powers" the Board could take regulatory action "necessary to implement the powers that are expressly given" and that "the Board has authority to enact procedures in addition to or other than the ones listed in the [RCCA]."

In accordance with the staff recommendations, the Board decided to affirm the hearing officer's decision with the exception of the decision to use the September 2000 rents rather than the September 1999 rents to calculate percentage decreases. A new calculation resulted.

*Petition for Writ of Mandate*

Appellant filed a petition for writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5 in the trial court, seeking review of the Board's decision. The court denied the writ petition. This appeal followed.

## DISCUSSION

### I

Preliminary, we note that, after receipt of the negative Board decision, appellant filed a petition for writ of administrative mandate under Code of Civil Procedure section 1094.5. Section 1094.5 permits trial court review of quasi-judicial administrative decisions, that is, the decisions that result when the agency has exercised its discretion and applied the governing regulations and law to a particular factual situation. (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 123 [109 Cal.Rptr. 799, 514 P.2d 111].) The scope of review under section 1094.5 was laid out by the Supreme Court in *Selby Realty Co. v. City of San Buenaventura*: "Subdivision (b) of section 1094.5 of the Code of Civil Procedure provides that the scope of inquiry in a mandamus proceeding brought to inquire into the validity of a final administrative order shall extend to whether the respondent has proceeded without or in excess of jurisdiction, whether there was a fair trial, and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the decision is not supported by the findings, or the findings are not supported by the evidence." (10 Cal.3d at pp. 123–124.)

Appellant contended in its petition that the Board "proceeded in excess of jurisdiction and/or authority" and "failed to proceed in the manner required by law"; that its "decision is not supported by the findings"; and that "the findings are not supported by the evidence." In its prayer for relief it sought reversal of the Board's decisions with respect to specific petitions. Accordingly, we do not view the petition as a facial challenge to the Regulation. (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145] ["A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual"].) Instead, we view it as an "as applied" challenge, seeking "relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied." (*Ibid.*) As explained in *Woods v. Superior Court* (1981) 28 Cal.3d 668 [170 Cal.Rptr. 484, 620 P.2d 1032], the validity of an administrative regulation as applied to a petitioner can be challenged in a section 1094.5 writ petition " 'where the basis of the challenge is that the regulation or some portion thereof is not a reasonable interpretation of the statute . . . and is therefore void.' " (*Woods v. Superior Court, supra,* at p. 678, quoting *Verdugo Hills Hospital, Inc. v. Department of Health* (1979) 88 Cal.App.3d 957, 962–963 [152 Cal.Rptr. 263].) In such a case, "[i]f the . . . court should find that the regulations are invalid as applied to [petitioners], it may grant them relief for [the agency's] 'abuse of discretion' in applying invalid regulations." (*Woods v. Superior Court, supra,* 28 Cal.3d at p. 678.)

Concerning the standard of review, when an appeal is made from the trial court's determination, the appellate court " 'must examine the findings made by the [agency] itself to determine whether they were supported by substantial evidence, rather than limiting ourselves to a review of the findings made by the trial court. [Citations.]' " (*Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212 [30 Cal.Rptr.2d 95], quoting *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 334–335 [25 Cal.Rptr.2d 842].) When the issue involves interpretation of a controlling statute, " '[t]he appropriate mode of review in such a case is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction. [Citation.]' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] .) "The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued." (*Id.* at p. 11, fn. 4.)

## II

With these general principles in mind, we first address the issue of whether the Board exceeded its authority by initiating a petition on behalf of tenants who had not undertaken to file petitions or otherwise raise formal complaints on their own. This requires analysis of the RCCA—the city ordinance from which the Board draws its authority.

As set forth in *Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 957 [81 Cal. Rtpr. 2d 93, 968 P.2d 993], in 1979, "the City of Santa Monica . . . adopted [the RCCA] . . . and created . . . [the Board] to regulate rentals. Among other things, the [RCCA] requires that owners register each rental unit and pay annual registration fees to the Board, establishes maximum allowable rents, provides for annual general adjustments and individual adjustments of allowable rents, prohibits evictions except for specified reasons, and prescribes remedies for violations of its provisions." The stated purpose of the RCCA is as follows: "A growing shortage of housing units resulting in a low vacancy rate and rapidly rising rents exploiting this shortage constitute a serious housing problem affecting the lives of a substantial portion of those Santa Monica residents who reside in residential housing. In addition, speculation in the purchase and sale of existing residential housing units results in further rent increases. These conditions endanger the public health and welfare of Santa Monica tenants, especially the poor, minorities, students, young families, and senior citizens. The purpose of this Article, therefore, is to alleviate the hardship caused by this serious housing shortage by establishing a Rent Control Board empowered to regulate rentals in the City of Santa Monica so that rents will not be increased unreasonably and so that landlords will receive no more than a fair return." (Santa Monica Charter, art. XVIII, Rent Control, § 1800.)

"In order to accomplish this purpose," the RCCA goes on to state, "this Article provides for an elected Rent Control Board to ensure that rents are at a fair level by requiring landlords to justify any rents in excess of the rents in effect one year prior to the adoption of this Article. Tenants may seek rent reductions . . . by establishing that those rents are excessive." (Santa Monica Charter, art. XVIII, Rent Control, § 1800.)

Under section 1803(f) of the RCCA, the Board was given certain "powers and duties" including the following: "(1) Set the rent ceilings for all controlled rental units[;] [¶] . . . [¶] (3) Establish a base rent ceiling on rents under Section 1804(b)[;] (4) . . . [m]ake adjustments in the rent ceiling in accordance with Section 1805[;] [and] (5) Set rents at fair and equitable levels in order to achieve the intent of this Article." In addition, the Board is to "issue and follow such rules and regulations, including those which are contained in this Article, as will further the purposes of the Article."

Section 1805(b), which governs "Individual and General Adjustment of Ceilings on Allowable Rents," states that with respect to *general* adjustments the Board "may, after holding those public hearings prescribed by Section 1803(g), set and adjust upward or downward the rent ceiling for all controlled rental units in general and/or for particular categories of controlled rental units deemed appropriate by the Board." With respect to *individual* adjustments, section 1805(c) provides: "*[u]pon receipt of a petition by a landlord and/or a tenant*, the maximum rent of individual controlled rental units may be adjusted upward or downward in accordance with the procedures set forth elsewhere in this Section" and that "the Board shall enact rules and regulations governing hearings and appeals of individual adjustment of ceilings or allowable rents . . . ." (Italics added.)

The rent decreases at issue here are individual adjustments governed by section 1805(c). Section 1805(c) gives the Board power to act "upon receipt of a petition by a landlord and/or a tenant." By promulgating Regulation 4400, the Board has taken the position that section 1805(c) authorizes it to initiate petitions for individual rent adjustments anytime a construction problem that appears to affect two or more units in a particular building comes to its attention. The issue is whether the Board has reasonably interpreted its governing ordinance.

"The construction of a municipal ordinance is governed by the same rules as the construction of statutes. [Citation.] [¶] Ambiguity is generally a condition precedent to interpretation. [Citation.] If the words of an enactment, given their ordinary meaning, are reasonably free from ambiguity, the courts will look no further to ascertain the meaning of the statute. [Citation.] The literal meaning may be disregarded, however, to avoid absurd results or to give effect to manifest purposes that, in light of the statute's legislative history, appear from its provisions considered as a whole. [Citation.]" (*City of Los Angeles v. Los Olivos Mobile Home Park* (1989) 213 Cal.App.3d 1427, 1433 [262 Cal.Rptr. 446].) " '[I]t is fundamental in our law that an administrative agency may not, under the guise of its rule-making power, abridge or enlarge its authority or act beyond the powers given to it by the statute which is the source of its power . . . .' " (*San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 603 [51 Cal.Rptr.2d 897], quoting *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 329–330 [19 Cal.Rptr. 492, 369 P.2d 20].) " 'Administrative regulations that alter or amend the statute or enlarge or impair its scope are void . . . .' " (*San Bernardino Valley Audubon Society, supra*, 44 Cal.App.4th at p. 603, quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].)

██ In our view, the words of the RCCA are clear. Requests for individual adjustments are to be initiated by the landlord or the tenant, and

the Board's power in this area is limited to formalizing rules of conduct for individual adjustment hearings. Regulation 4400 thus represents an unauthorized expansion of the Board's authority in the community and a major departure from its original role. Such a departure might be appropriate if the challenged provision were " 'consistent and not in conflict with the enabling statute and reasonably necessary to effectuate its purpose' " or " 'fill[ed in] the details of the enabling legislation' " or " 'reasonably interpreted the legislative mandate.' " (*Da Vinci Group v. San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24, 29–30 [6 Cal.Rptr.2d 461], quoting *Fox v. San Francisco Residential Rent etc. Bd.* (1985) 169 Cal.App.3d 651, 655–656 [215 Cal.Rptr. 565] .) But we do not believe this to be the case with respect to the provision giving the Board the power to initiate construction petitions.

■ Although the RCCA's goal of keeping rents at below market levels favors tenants, the Board's primary function is to set rents at a "fair level" to ensure a "fair return" to landlords and thereby forestall constitutional challenges to the ordinance by landlords. (See *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 771–773 [66 Cal.Rptr.2d 672, 941 P.2d 851], and cases discussed therein.) This obligates the Board to act as a neutral arbiter of what is "fair." Thus, the Board's power to act on its own is limited to general or categorical rent adjustments set after public hearings. It was not given the power to initiate individual petitions. By taking that power onto itself, the Board transformed itself from an impartial arbiter of rent adjustments into an advocate for individual tenants.

Counsel for the Board described the power granted by Regulation 4400 to initiate construction petitions as a mere "procedural device," implying that construction petitions filed by the Board would inevitably have been the subject of tenant complaints. The facts in the present case demonstrate the artificiality of that line of reasoning. Despite being solicited by the Board and the tenants who filed the original four petitions, only three additional residents of the building came forward to file formal complaints. The hearing officer theorized that others felt intimidated or feared retaliation, but there was no evidence to support that conjecture. On the other hand, the petitions that were filed emphasized issues such as noise, dust, vibrations, and fumes— types of problems whose severity is dependant on the location of the apartment. The tenants who filed petitions described severe problems in these areas in their testimony at the hearing. The nonpetitioning tenants who testified had moderate or zero complaints about such matters. It is possible that the other tenants did not feel the impact of the construction as much as the tenants who filed petitions. The rationale behind the rule allowing Board-filed joint petitions—that tenants in the same building suffer the same deleterious effects from construction activities—is simply not borne out by the administrative record.

We find support for our conclusion in the Supreme Court's holding in *Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 426 [121 Cal.Rptr.2d 844, 49 P.3d 194]. The issue there was whether a public agency could file a court action for injunctive or declaratory relief when asked to disclose records under California's Public Records Act (Gov. Code, § 6250 et seq.). The agency in question filed a declaratory relief action when a disappointed record seeker threatened action under Government Code section 6258, which provides: " 'Any person may institute proceedings for injunctive or declarative relief or writ of mandate in any court of competent jurisdiction to enforce his or her right to inspect or to receive a copy of any public record or class of public records under [the Act].' " (*Filarsky v. Superior Court, supra,* 28 Cal.App.4th at p. 426.) The agency claimed to be " 'accommodat[ing]' " the citizen's desire to litigate the matter. (*Id.* at p. 424.)

The court looked first at the plain language of the provision, emphasizing that it "contemplates a declaratory relief proceeding commenced only by an individual or entity seeking disclosure of public records, and not by the public agency from which disclosure is sought." (*Filarsky v. Superior Court, supra,* 28 Cal.App.4th at p. 426.) The court then looked at the underlying purpose of the act and concluded that this limitation was "logical and consistent with the policies underlying [it]" because "[a] public agency's initiation of an action regarding disclosure *before* a person commences litigation to require disclosure frustrates the purpose of the Act by discouraging requests for public records and requiring persons who make such requests to defend lawsuits they otherwise might not initiate" and "results in a waste of judicial resources." (*Id.* at p. 432.)

■ By authorizing Board-initiated petitions, Regulation 4400 similarly generates administrative actions that likely would not otherwise go forward, and wastes city resources. It could easily lead to administrative decisions unsubstantiated by the evidence because tenants who cannot be bothered to submit a formal petition of their own are unlikely to appear and testify at a hearing in support of a Board petition. It places the Board in an unnecessarily antagonistic position vis-à-vis landlords. It perpetuates a confrontational atmosphere in rent-controlled buildings. In the long run, it may even discourage upkeep of buildings given that a well-meant but poorly managed construction project could lead to Board intervention without regard to the desires of the majority of the tenants. Under the circumstances, we agree with appellant that the Board acted "without jurisdiction" when it granted its own petition for individual rent adjustments. The trial court should have granted the administrative writ petition and ordered the Board to reverse its decision.

## III

Other issues must be addressed with regard to the petitions filed by individual tenants, real parties Lodwick, Kuraica, Yourist, Wagner, Hart, Libenson, and Nicolaisen. Appellant argues that the regulations governing construction petitions represent an unconstitutional exercise of judicial power as discussed in *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348 [261 Cal.Rptr. 318, 777 P.2d 91]. The issue in *McHugh* revolved around a provision in the RCCA, later amended, that permitted renters who had been required by a landlord to pay rent in excess of the maximums permitted by the RCCA to recover not just the excess rent but also to recover a penalty of treble damages. Two tenants established to the satisfaction of the Board that they had been charged excess rent by a particular landlord. One of the tenants had, in the meantime, vacated the building. As to him, the Board ordered the landlord to pay the excess rent plus the treble damages penalty in cash. The other tenant was permitted to pay no rent until the excess rent plus treble damages had been recouped. The landlord challenged both the Board's power to adjudicate the excess rent claim and its power to award treble damages.

The landlord's challenge was based on Article VI, section 1 of the California Constitution, which provides: "The judicial power of this State is vested in the Supreme Court, courts of appeal, superior courts, municipal courts, and justice courts . . . ." (Cal. Const., art. VI, § 1; see *McHugh v. Santa Monica Rent Control Bd., supra*, 49 Cal.3d at p. 355.) An earlier Supreme Court decision, *Jersey Maid Milk Products Co. v. Brock* (1939) 13 Cal.2d 620 [91 P.2d 577], had struck down regulations permitting the Director of Agriculture to entertain and resolve complaints by milk producers against milk distributors based on failure to pay minimum prices for milk. The court in *McHugh* concluded, however, that the rationale for the holding was unclear and that "the *Jersey Maid* decision might have rested on a conclusion that the provision was unconstitutional because it did not specifically provide for judicial review of the administrative determination." (*McHugh v. Santa Monica Rent Control Bd., supra*, 49 Cal.3d at p. 358.) The *McHugh* court held there was no absolute prohibition on administrative adjudication of money claims between private individuals. Instead, it adopted the following "crucial and workable limiting principle: The agency may exercise *only those powers that are reasonably necessary to effectuate the agency's primary, legitimate regulatory purposes.*" (*Id.* at p. 372.) With respect to the determination that the landlord was obligated to disgorge excess rents, either through a cash payment or through reduction in current rent, the court held "such actions, although judicial in nature, are both authorized by the [RCCA] and reasonably necessary to accomplish the administrative agency's primary, legitimate regulatory purposes, i.e., setting and regulating maximum rents in the local housing market. The Board's legitimate regulatory authority, and hence its incidental remedial authority, is circumscribed. It may not, and does

not, hear and adjudicate all manner of disputes between landlords and tenants. Its authority . . . extends only so far as necessary to set and regulate rents. Incidental to that legitimate primary purpose—and 'in order to produce an efficient and effective administrative enforcement of the public interest' [citation], the Board may review the rents actually charged, and order necessary adjustments to assure compliance with its price control regulations. [¶] The trial court erred therefore in concluding that the Board exercised judicial powers in violation of the Constitution by adjudicating (subject to judicial review) tenants' claims for excess rents, and ordering restitution of the excess amounts." (*Id.* at p. 375.)[4]

The *McHugh* decision instructs courts faced with challenges to an agency's quasi-judicial powers to "carefully apply the 'reasonable necessity/legitimate regulatory purpose' requirements in order to guard against unjustified delegation of authority to decide disputes that otherwise belong in the courts"; to "inquire whether the challenged remedial power is authorized by legislation, and reasonably necessary to accomplish the administrative agency's regulatory purposes"; and to "closely scrutinize the agency's asserted regulatory purposes in order to ascertain whether the challenged remedial power is merely incidental to a proper, primary regulatory purpose, or whether it is in reality an attempt to transfer determination of traditional common law claims from the courts to a specialized agency whose primary purpose is the processing of such claims." (*McHugh v. Santa Monica Rent Control Bd., supra,* 49 Cal.3d at p. 374, fn. omitted.) To exemplify an illegitimate attempt to transfer common law claims from the courts, the court stated that it "would not approve the Board's adjudication of a landlord's common law counterclaims (extraneous to the Board' s regulatory functions) against a tenant. Such adjudication would (i) not reasonably effectuate the Board's regulatory purposes—ensuring enforcement of rent levels—and (ii) it would shift the Board's primary purpose from one of ensuring the enforcement of rent levels, to adjudicating a broad range of landlord-tenant disputes traditionally resolved in the courts." (*Ibid.*)

In connection with this argument, appellant points out that the Regulation was passed by the Board in 1999, 20 years after the RCCA went into effect, which means that the Board's interpretation of its own powers under the RCCA is not entitled to significant weight. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388 [241 Cal.Rptr. 67, 743 P.2d 1323] [because only "[t]he contemporaneous construction of a new enactment by the administrative agency . . . is entitled to great weight,"

---

[4] The court went on to hold that treble damages were impermissible and that the Board should not have issued a self-enforcing judgment without provision for court review. No such issues are involved here.

the court independently interpreted the governing statute and held that a regulation promulgated more than 20 years after the statute's enactment was invalid].)

We agree that because the Board waited 20 years to promulgate a regulation giving it power to oversee construction-related impact on rental units, there is little reason for a court to defer to its interpretation of the RCCA. However, our own reading of the RCCA leads us to believe that the Board has not exceeded its authority in promulgating Regulation 4400 other than as discussed above. Section 1805(e) states that in setting individual rents the Board can consider such factors as "increases or decreases in operating . . . expenses," "increases or decreases in . . . equipment, or services," "substantial deterioration of the controlled rental unit other than as a result of ordinary wear and tear," and "failure on the part of the landlord to provide adequate housing services or to comply substantially with applicable housing, health and safety codes." Regulation 4200 permits rent decreases based on "reduced base amenities of a unit," including loss of parking; laundry facilities; security gates, doors and fencing; recreational facilities; yards; and landscaping, and on lack of maintenance including "[a]ccumulation of garbage, debris or other inappropriate materials in common areas." (Regulation 4200(d), (f).)

■ The Regulation seeks to prevent landlords from undermining the RCCA by depriving renters of facilities and services that were used to justify the rent charged through the guise of lengthy construction projects. Even without Regulation 4400, landlords doing business in the City of Santa Monica could not expect to deprive tenants of common area facilities for extended periods of time without good reason and suffer no consequences. The evidence presented to the Board established that prior to 1998, the tenants of appellant's building had available to them a recreation room, a sauna, a spa, a laundry, security gates, and an outdoor garden area, in addition to a well-maintained mail room, lobby, and stairwell. For well over two years, they were deprived of these facilities due to demolition and failure to reconstruct. In another factual setting, a landlord might validly raise the issue of whether the Board could properly take it upon itself to determine what is and is not a "reasonable" construction schedule for various capital improvements.[5] Here, however, the evidence is clear that appellant simply tore out existing facilities and left them in a dilapidated, unsafe, and unusable condition for months or years at a time *while no construction whatsoever* took place. The amounts deducted for loss of these facilities represented a

---

[5] A landlord might have numerous reasons for going slowly, among them being the availability of funds, the schedule of a preferred contractor or craftsman, or even the desire to ameliorate the impact of a large project by proceeding in slow steps or minimizing the hours during which construction takes place.

reasonable adjustment apart from question of the validity of Regulation 4400. Dirt, debris, trenches, exposed electrical wires, missing window panes, paper-covered floors, and the other defects and hazards described by the tenants and Board inspectors are no less obnoxious because they are the result of deliberate demolition rather than refusal to perform maintenance. Appellant presented no evidence of a construction-related reason *or any reason* for failing to keep the facilities in operation and the premises in good repair. The award was justified.

## A

Appellant cites *Sterling v. Santa Monica Rent Control Bd.* (1985) 168 Cal.App.3d 176 [214 Cal.Rptr. 71] for the proposition that only defects rising to the level of safety code violations may be considered by the Board. Appellant misreads the case. At issue in *Sterling* was a trial court decision that section 1805(e) of the RCCA, setting forth general criteria to be considered in making individual adjustments of rent upward or downward, should not have included violation of " 'state and local health and safety laws or habitability problems.' " (*Id.* at p. 180.)[6] The trial court reasoned that " '[s]tate and local, health and safety laws are enforced by agencies other than [the Board]' "and that " 'tenants who have minor maintenance or repair problems with a unit are authorized pursuant to Civil Code Section 1942 to repair any "dilapidations rendering the premises untenantable, which the landlord ought to repair" and to "deduct the expenses of such repairs from the rent when due." ' " (*Sterling,* at p. 181.) Thus, " 'tenant remedies for violations of health and safety code standards and for dilapidations are extensive, and nowhere is there any authorization for respondent to award damages in the form of rent withholding to enforce any such codes.' " (*Ibid.*)

On appeal, the Board contended the trial court erred in prohibiting it from considering all the criteria listed in section 1805(e) of the RCCA. The appellate court agreed. In reversing the trial court's decision, the appellate

---

[6] Section 1805(e) currently provides that "[t]he Board shall consider all factors relevant to the formula it employs; such factors may include: increases or decreases in operating and maintenance expenses, the extent of utilities paid by the landlord, necessary and reasonable capital improvement of the controlled rental unit as distinguished from normal repair, replacement and maintenance, increases or decreases in living space, furniture, furnishings, equipment, or services, substantial deterioration of the controlled rental unit other than as a result of ordinary wear and tear, failure on the part of the landlord to provide adequate housing services or to comply substantially with applicable housing, health and safety codes, federal and state income tax benefits, the speculative nature of the investment, whether or not the property was acquired or is held as a long term or short term investment, the landlord's rate of return on investment, the landlord's current and base date Net Operating Income, and any other factor deemed relevant by the Board in providing the landlord a fair return." (Santa Monica Charter, art. XVIII, Rent Control, § 1805(e).)

court in *Sterling* quoted with approval this statement from *Carson v. Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184 [197 Cal.Rptr. 284, 672 P.2d 1297]: "Rent control would be self-defeating were landlords permitted to reduce maintenance expenditures and allow buildings to deteriorate because their profits have been regulated downward." (*Sterling v. Santa Monica Rent Control Bd., supra,* 168 Cal.App.3d at p. 183.) The court concluded that the reasoning applied with equal force to the case before it: "If no condition has changed except the decrease in maintenance expenses or reduction in services, the rent presently being charged has become excessive, returning to the landlord a higher profit than had been previously adjudged fair." (*Ibid.*) Since simple maintenance issues could lead to lesser rent, the court saw no reason why violations of health and safety codes should not. It concluded there was "no issue of a more particularized preemption with respect to conditions which constitute breaches of the implied warranty of habitability or violations of housing, health and safety codes. The board does not seek to enforce either the implied warranty or the codes when it hears and determines petitions for rent decreases. Such conditions simply are included among the guidelines the board is to use in determining whether a rent decrease is warranted." (*Id.* at p. 184.)

The decision in *Sterling* that there was no reason the Board should *not* consider health and safety violations in setting fair rents, in no way supports appellant's argument here that *only* health and safety violation should be considered. Moreover, appellant's suggestion that *Sterling* somehow precludes the Board from ordering recovery of excessive past rents by withholding current and future rents is also belied by the court's actual holding. The trial court had ruled that " 'by allowing a decision of a hearing examiner to take effect prior to Board review, [the Board] is effectively awarding retroactive relief.' " (*Sterling v. Santa Monica Rent Control Bd., supra,* 168 Cal.App.3d at p. 182.) The trial court did not believe the Board was permitted to give prospective rent reductions to alleviate past abuses, particularly since such reductions became effective before the landlord could obtain judicial review, and ordered that decisions as to rent decreases be stayed pending final adjudication on appeal. (*Id.* at p. 186.) Again, the appellate court disagreed: "Contrary to the view of the superior court, there is not any question in the instant matter of an unconstitutional exercise of judicial power or of the awarding of damages. In all cases, respondent's determinations are prospective in nature. Tenants are not authorized to withhold rent as compensation for the landlord's failures; respondent's hearing officer makes a factual determination, on the evidence, of the appropriate maximum allowable rent to be charged in the *future* only. An administrative body may make factual determinations so long as those determinations are subject to judicial review. [Citation.] Respondent's decisions are subject to judicial review via administrative mandamus. [Citations.]" (*Ibid.*)

■ In other words, because of the availability of judicial review, the court upheld the Board's right to award relief for past excessive rent through prospective rent decreases. Appellant misreads the holding in *Sterling* when it suggests otherwise in its brief. More importantly, as we have seen, the same type of remedy was upheld by the Supreme Court in *McHugh v. Santa Monica Rent Control Bd., supra,* 49 Cal.3d 348, where the tenant was permitted to withhold *all* rent due for several months to make up for past charges. Thus, the authorities conclusively establish that there is nothing inappropriate about the remedy of reduction of future rents to compensate for past excesses.

B

Appellant claims that *Golden Gateway Center v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (1999) 73 Cal.App.4th 1204 [87 Cal.Rptr.2d 332] supports its view that Regulation 4400 does not rationally advance the purposes of the RCCA. The regulation at issue in *Golden Gateway* sought to recompense tenants for all inconveniences caused by construction of any type even when it was reasonably necessary and took a reasonable time to complete. The landlord in *Golden Gateway* took four months to repair, waterproof, and paint the concrete exterior of the buildings and decks, to replace all deck railings to correct potential safety problems, and to install new flooring on all deck surfaces. The tenants filed petitions seeking rent decreases, and hearing officers ruled that they had suffered "a substantial decrease in housing services" during the time the decks were unavailable for normal use. The issue faced was whether "interference with housing services resulting from reasonably necessary repair and maintenance to rental units, without a substantial impact upon the right to occupy the premises as a residence, represent[s] a decrease in services justifying a corresponding reduction in rent under the ordinance." (*Id.* at p. 1209.) Recognizing this as a matter of "first impression in California" (*ibid*), the court concluded that "[i]n the present case, a housing service did not *cease* to be provided; rather, by undertaking to *provide* housing services—repair, maintenance and paint—another service was temporarily interrupted." (*Id.* at p. 1212.) In that type of situation, "[i]t would be unworkable and unreasonable to apply the ordinance . . . . The ordinance contemplates that landlords will provide repair and maintenance services, which by necessity will at times inconvenience the tenants. . . . [This] type of inconvenience, which may interfere with housing services but which does not substantially interfere with the right to occupy the premises as a residence, does not entitle a tenant to a reduction in rent." (*Ibid.*) The court noted that "[t]here is no allegation or evidence in the record that the deck work was carried out in an unreasonable manner or that it took too long" and therefore it "d[id] not consider the effect such evidence would have on a tenant's claim for reduced rent." (*Id.*, at p. 1212, fn. 7.)

Appellant's attempted reliance on *Golden Gateway* overlooks that the court expressly did not resolve the issue of whether the Board could control the manner and timing of construction. A project that results in once-available facilities being closed for years not because repairs and construction are ongoing but because they have been commenced and indefinitely interrupted could conceivably represent an attempt to deprive tenants of services. As the court stated in *Golden Gateway*, "the ordinance was designed to control both 'front door' and 'back door' rent increases. Thus, when a service that had been provided as part of the tenant's rental package ceased to be provided, the tenant could not reasonably be expected to continue paying the same rent." (*Golden Gateway Center v. San Francisco Residential Rent Stabilization & Arbitration Bd., supra*, 73 Cal.App.4th at pp. 1211–1212.) The holding of that case, if anything, is supportive of the Board's decision.

## IV

Appellant's final contention is that the Board's decision is not supported by the facts, specifically the finding that the construction work was carried out in an unreasonable manner or took an unreasonably long time to complete. As we have discussed, the hearing officer admitted that Harreschou "was planning to review the testimony of the owner's contractors, including what was in the building before, the scope of work, the size of crews, the budget, and so forth, and then provide an opinion as to how long the entire job should reasonably have taken" but was unable to do so because "the owners failed to present any testimony on the above subjects, nor did they submit any blueprints, plans, bids, contracts, permits or other documents which would have helped Mr. Harreschou reconstruct what work was done, how and by whom." Appellant contends that the failure of the Board's expert witness to review plans and work and come to specific conclusions concerning the reasonable time for completion of each project compels reversal. We do not agree.

First, Harreschou gave rough times estimates for most of the ongoing projects. Although review of the plans and work schedules would certainly have resulted in greater precision, absolute perfection was not required under the circumstances. The tenants testified concerning the lengthy periods when no work at all was being performed, and the general time frame during which various facilities were out of commission. Because the Regulation did not go into effect until October 1999, more than a year after construction began, and because construction had not been completed even as of the date of the hearing, the hearing officer was able to use rough figures that gave the benefit of any doubt to appellant.

Second, as we have said, even in the absence of Regulation 4400, the reductions granted by the Board were justified by the reduction in facilities

available to the tenants. The hearing officer gave the benefit of the doubt to appellant, using periods of less than a year for calculation of rent reductions even though the evidence was uncontradicted that major disruptions were ongoing for close to three years. Although in another factual situation, the failure to be more precise concerning reasonable time or manner of construction might be fatal to a Board determination, in this case, the figures utilized by the hearing officer were clearly justified.

## DISPOSITION

The judgment with respect to the Board's petition (W-0001) is reversed. The trial court is directed to issue a writ compelling the Board to set aside its order of November 9, 2000, adopting the hearing officer's decision with regard to petition W-0001, and to enter a new and different order reversing the hearing officer's decision with regard to that petition only. The judgment is affirmed in all other respects. Each side is to bear its own costs.

Vogel (C. S.), P. J., and Epstein, J., concurred.