[No. A125887. First Dist., Div. One. Feb. 23, 2011.]

NORMAN T. LARSON et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

1264

1270

COUNSEL

Wiegel & Fried, John Peara Baba; Nielsen, Merksamer, Parrinello, Mueller & Naylor, James R. Parrinello and Christopher E. Skinnell for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Wayne Snodgrass, Deputy City Attorney, and Tara Michelle Steeley, Deputy City Attorney, for Defendant and Appellant.

OPINION

**BANKE, J.—**

## I. INTRODUCTION

Appellants Norman T. Larson, San Francisco Apartment Association, San Francisco Association of Realtors, Coalition for Better Housing, Round Hill Pacific, and John Zanghi (appellants) challenge provisions of Proposition M, a voter-approved initiative amending San Francisco's Residential Rent Stabilization and Arbitration Ordinance (hereafter, the Rent Ordinance). Proposition M augmented the antiharassment provisions of the ordinance by

expanding the definition of "decrease in [housing] services" to include a list of "bad faith" acts by landlords and their agents—ranging from violating any state or local antidiscrimination law, to failing to cash a rent check within 30 days, to interfering with a tenant's right to privacy. Upon finding any such harassment and thereby a "decrease in [housing] services," the San Francisco Rent Board (Board) can order a reduction in rent. By how much and for how long is not specified in the proposition, nor are any criteria provided for making such determinations. Proposition M also added an attorney fees provision to the Rent Ordinance, mandating an award of fees to a prevailing tenant in an unlawful detainer case brought under state law.

The trial court upheld the decrease in housing services provisions of Proposition M, except for one phrase which is no longer at issue, but invalidated the attorney fees provision. Appellants appeal as to the decrease in housing services provisions of the proposition. The City and County of San Francisco (City) cross-appeals as to the attorney fees provision. We reverse, in part, and affirm, in part.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In November 2008, San Francisco voters approved Proposition M, an initiative measure that amended the City's Rent Ordinance (S.F. Admin. Code, § 37.1 et seq.).[1] The voter materials stated the amendments were necessary to ensure property owners do not abuse their statutory rights under the Costa-Hawkins Rental Housing Act (hereafter Costa-Hawkins Act; Civ. Code, § 1954.50 et seq.), which was enacted in 1995, to raise rent to market rates on vacated units. The voter materials described several reports of harassing conduct aimed at getting tenants to move.

Prior to the passage of Proposition M, the City's Rent Ordinance defined "housing services" as follows: "services provided by the landlord connected with the use or occupancy of a rental unit including, but not limited to: repairs, replacement, maintenance; painting; light; heat; water; elevator service; laundry facilities and privileges; janitor service; refuse removal; furnishings; telephone; parking; rights permitted the tenant by agreement, including the right to have a specific number of occupants . . . and any other benefits, privileges or facilities."[2] (Former § 37, subd. (g).)

---

[1] All further statutory references are to the San Francisco Administrative Code unless otherwise indicated.

[2] Similar definitions of "Housing Services" are found in many other rent control ordinances. (E.g., Berkeley Mun. Code, § 13.76.040(C); East Palo Alto Mun. Code, § 14.04.040; Hayward Ord. No. 03-01, § 2(e); L.A. Mun. Code, § 151.02; Los Gatos Mun. Code, § 14.80.020; Oakland Mun. Code, § 8.22.020; San Jose Mun. Code, § 17.23.110; Santa Monica Mun. Code, § 4.56.010(b); Thousand Oaks Ord. No. 956-NS, § III(F); West Hollywood Mun. Code, § 17.08.010(10).)

Proposition M added to this definition of "Housing Services," the "quiet enjoyment of the premises, without harassment by the landlord as provided in Section 10B." (Underscoring omitted; see § 37.2, subd. (g).)

New section 37.10B lists more than a dozen prohibited acts of "harassment." It provides: "No landlord, and no agent, contractor, subcontractor or employee of the landlord, shall, do any of the following, bad faith or with ulterior motive or without honest intent. [¶] (1) Interrupt, terminate or fail to provide housing services required by contract or by State, County or local housing health or safety laws; [¶] (2) Fail to perform repairs and maintenance required by contract or by State, County or local housing, health or safety laws. [¶] (3) Fail to exercise due diligence in completing repairs and maintenance once undertaken or fail to follow appropriate industry repair containment or remediation protocols designed to minimize exposure to noise, dust, lead paint, mold, asbestos, or other building materials with potentially harmful health impacts. [¶] (4) Abuse the landlord's right of access into a rental housing unit as that right is provided by law; [¶] (5) Influence or attempt to influence a tenant to vacate a rental housing unit through fraud, intimidation or coercion; [¶] (6) Attempt[] to coerce the tenant to vacate with offer(s) of payments to vacate which are accompanied with threats or intimidation; [¶] (7) Continue to offer payments to vacate after tenant has notified the landlord in writing [that] they no longer wish to receive further offers of payments to vacate; [¶] (8) Threaten the tenant, by word or gesture, with physical harm; [¶] (9) Violate any law which prohibits discrimination based on actual or perceived race, gender, sexual preference, sexual orientation, ethnic background, nationality, place of birth, immigration or citizenship status, religion, age, parenthood, marriage, pregnancy, disability, AIDS or occupancy by a minor child. [¶] (10) Interfere with a tenant[']s right to quiet use and enjoyment of a rental housing unit as that right is defined by California law; [¶] (11) Refuse to accept or acknowledge receipt of a tenant's lawful rent payment; [¶] (12) Refuse to cash a rent check for over 30 days; [¶] (13) Interfere with a tenant's right to privacy. [¶] (14) Request information that violates a tenant's right to privacy, including but not limited to residence or citizenship status or social security number. [¶] (15) Other repeated acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of any person lawfully entitled to occupancy of such dwelling unit and that cause, are likely to cause, or are intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy." (§ 37.10B, subd. (a).)

The proposition further specified any conduct violating new section 37.10B constitutes a "substantial and significant decrease in services as defined in Section 37.2[, subdivision] (g) and tenants may file a petition with the Rent Board for a reduction in rent." (Underscoring omitted; see § 37.10B,

subd. (c)(1).) According to the voter materials, Proposition M thus provided tenants "a simple mechanism to stop harassment at the Rent Board, without lawyers or lawsuits."

Proposition M also provided for a civil remedy. A lawsuit can be initiated by "[a]ny person, including the City" against "[a]ny person who violates or aids or incites another person to violate" the provisions of section 37.10B. (Underscoring omitted; see § 37.10B, subd. (c)(3)(5).) In such action, "[a]ny person who violates or aids or incites another person to violate the provisions of this . . . Section is liable for each and every such offense for money damages of not less than three times actual damages suffered . . . (including damages for mental or emotional distress) . . . ." (Underscoring omitted; see *id.*, subd. (c)(5).) In addition, the proposition provided any violation of section 37.10B is a misdemeanor, punishable by a fine of up to $1,000 and six months in the county jail. (*Id.*, subd. (c)(2).)

Proposition M also added a mandatory cost and attorney fees provision to the Rent Ordinance, which states: "In any action to recover possession of a rental unit subject to the Chapter, unless the sole basis of the notice to quit is Section 37.9[, subdivision] (b),[3] the court shall award the tenant reasonable attorney fees and costs incurred in defending the action upon a finding that the tenant is the prevailing party under Code of Civil Procedure Section 1032[, subdivision] (a)(4)." (See § 37.10B, subd. (c)(6).)

Appellants filed a combined petition for writ of ordinary mandamus and complaint for declaratory relief challenging Proposition M on a number of grounds, including that the expanded decrease in housing services provisions violates the judicial powers clause of the California Constitution (Cal. Const., art. VI, § 1) and infringes on constitutionally protected speech rights, and the mandatory, tenant-only cost and attorney fees provision violates equal protection rights.

The trial court granted the petition and complaint in part. The court struck from new section 37.10B the prefatory phrase "with ulterior motive or without honest intent" on the ground it was undefined and failed to give adequate notice as to the nature of the conduct prohibited. In all other respects, the court upheld the decrease in housing services provisions. The court invalidated the cost and attorney fees provision on the ground it violated the equal protection clause. Appellants filed a timely notice of appeal as to all adverse portions of the judgment. The City filed a cross-appeal as to that portion of the judgment invalidating the cost and attorney fees provision.

---

[3] Section 37.9, subdivision (b), provides in pertinent part: "A landlord who resides in the same rental unit with his or her tenant may evict said tenant without just cause . . . ." (§ 37.9, subd. (b).)

## III. Discussion

A. *The Judicial Powers Clause*

Appellants contend Proposition M unlawfully invested the Board with judicial power in violation of the judicial powers clause of the California Constitution (Cal. Const., art. VI, § 1.) Specifically, they assert the expanded definition of "decrease in [housing] services" embracing the list of prohibited acts set forth in new section 37.10B, combined with the authority of the Board to order a reduction in rent of an unspecified amount and for an unspecified duration, effectively invests the Board with the power reserved to the judiciary to adjudicate tortious conduct and award general damages. We agree in part.[4] As to section 37.10B, subdivision (a)(1), (2) and (3), we conclude a facial challenge fails. As to section 37.10B, subdivision (a)(4) through (15), we conclude Proposition M violates the judicial powers clause to the extent it empowers the Board to order rent reductions for the conduct prohibited by this subdivision.

San Francisco is not the only rent control jurisdiction to enact tenant antiharassment provisions in the wake of the Costa-Hawkins Act (Civ. Code, § 1954.50 et seq.), which allows owners to raise rents to market rates on vacated units. (See, e.g., *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1237–1238 [63 Cal.Rptr.3d 398, 163 P.3d 89] [invalidating certain provisions of Santa Monica's tenant antiharassment ordinance enacted after reports of increased tenant harassment following passage of the Costa-Hawkins Act].) However, the approach taken by San Francisco in Proposition M stands in marked contrast to the approach taken by other municipalities.

While other rent control jurisdictions have prohibited certain actions by landlords aimed at dislodging tenants in order to increase rents to market rates, no other municipality deems such conduct to constitute a "decrease in [housing] services" for which a rent board can order a reduction in rent. Rather, other municipalities define a decrease in housing services as a type of harassment—not vice versa. (E.g., West Hollywood Mun. Code, § 17.52.090; Santa Monica Mun. Code, §§ 4.56.010, 4.56.020 [harassment includes an interruption, termination, or failure to provide housing services if done with malice]; Berkeley Rent Stabilization Bd. Regs., reg. No. 10, 1013(G)(2)(c)(iii) [harassment includes a "[r]eduction in housing services under circumstances evidencing the landlord's purpose to cause the tenant to vacate a controlled rental unit"].) Moreover, any such harassment is actionable in a *court* action,

---

[4] Our review of the trial court's judgment in this facial challenge to Proposition M is de novo. (*Baba v. Board of Supervisors* (2004) 124 Cal.App.4th 504, 512 [21 Cal.Rptr.3d 428] (*Baba*).)

instituted by an aggrieved tenant or the rent control jurisdiction, wherein the court can award both general and special *damages* (and often treble damages). (E.g., Santa Monica Mun. Code, § 4.56.040; West Hollywood Mun. Code, § 17.68.010; see also Berkeley Mun. Code, § 13.76.150.)[5]

■ We now turn to the governing law. Article VI, section 1, of the California Constitution provides: "The judicial power of this State is vested in the Supreme Court, courts of appeal, and superior courts . . . ." (Cal. Const., art. VI, § 1.) "[A]gencies not vested by the Constitution with judicial powers may not exercise such powers." (*McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 356 [261 Cal.Rptr. 318, 777 P.2d 91] (*McHugh*).)

■ In *McHugh*, the Supreme Court considered whether the power of Santa Monica's rent board to adjudicate excess rent claims and award treble damages violated the judicial powers clause. (*McHugh, supra,* 49 Cal.3d at p. 359.) In canvassing the applicable legal principles, the court articulated the following standard for evaluating judicial powers challenges to adjudicatory administrative action: "An administrative agency may constitutionally hold hearings, determine facts, apply the law to those facts, and order relief— including certain types of monetary relief—so long as (i) such activities are authorized by statute or legislation and are reasonably necessary to effectuate the administrative agency's primary, legitimate regulatory purposes, and (ii) the 'essential' judicial power (i.e., the power to make enforceable, binding judgments) remains ultimately in the courts, through review of agency determinations." (*Id.* at p. 372, italics omitted.)

The court held the rent board could adjudicate excess rent claims and order restitution of any excess rent since such actions were authorized by the city ordinance and reasonably necessary to accomplish the board's legitimate regulatory purposes—the setting and regulating of maximum rents in the local housing market. (*McHugh, supra,* 49 Cal.3d at p. 375.) The board could not, however, order the immediate withholding of excess rent because such action effectively foreclosed judicial review and thus represented "an unwarranted intrusion into the power of the courts to 'check' administrative

---

[5] We also note Proposition M is not the first effort by San Francisco to address concerns about the Costa-Hawkins Act. In *Baba, supra,* 124 Cal.App.4th 504, Division Two of this court considered a provision added to the Rent Ordinance to prevent threatened (but not effectuated) "Ellis Act" evictions as a means to recover and rerent units at market rates. The court invalidated the provisions as unlawfully suppressing protected speech. (*Baba,* at pp. 514–527.) In *Bullard v. San Francisco Residential Rent Stabilization Bd.* (2003) 106 Cal.App.4th 488 [130 Cal.Rptr.2d 819] (*Bullard*), Division Three of this court considered an addition to the Rent Ordinance that (a) required any owner who evicted a tenant in order to move into the unit to offer the tenant another unit if one was available and (b) restricted the rent on the alternative unit. The court invalidated the provision as "subvert[ing] the purpose of the Costa-Hawkins Act." (*Bullard,* at pp. 491–492.)

adjudications." (*Id.* at pp. 376–377.) Nor could the board impose treble damages, in contrast to awarding " 'restitutive' excess rent amounts." (*Id.* at pp. 378–379.) There was "no reason to believe" other regulatory remedies, such as fines and penalties, or costs and attorney fees, would be "insufficient" to secure compliance with the ordinance. (*Id.* at p. 379.) "Most significantly," the power to award treble damages posed "a risk of producing arbitrary, disproportionate results that magnify, beyond acceptable risks, the possibility of arbitrariness inherent in any scheme of administrative adjudication." (*Ibid.*)

The Supreme Court elaborated further on the judicial powers clause in *Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245 [284 Cal.Rptr. 718, 814 P.2d 704] (*Walnut Creek Manor*). In *Walnut Creek Manor*, the court considered whether the Fair Employment and Housing Commission could, under the then operative statutory scheme, award general compensatory damages, including for emotional distress. (*Id.* at pp. 251, 255.) The court first observed it was "apparent from *McHugh* that [a] judicial powers analysis contemplates a somewhat higher level of scrutiny than rational basis." (*Id.* at p. 257.) A court must " 'closely scrutinize the agency's asserted regulatory purposes in order to ascertain whether the challenged remedial power is merely incidental to a proper, primary regulatory purpose, or whether it is in reality an attempt to transfer determination of traditional common law claims from the courts to a specialized agency whose primary purpose is the processing of such claims.' " (*Id.* at p. 256, quoting *McHugh, supra*, 49 Cal.3d at p. 374.)

The court recognized compensatory damages serve to deter discrimination. However, the issue, explained the court, was whether a substantial award of compensatory damages was " 'reasonably necessary' " to accomplish the commission's regulatory purpose and " 'merely incidental' " to its "primary regulatory purposes," or whether "in reality" the commission was exercising the judicial function to determine traditional common law claims. (*Walnut Creek Manor, supra*, 54 Cal.3d at pp. 258–259.) The court concluded only "minimal and limited" damages awards were incidental to the commission's primary role. (*Id.* at p. 261.) And "what once was an alternative or incidental adjunct to the primary relief of securing the same or comparable housing, ha[d] assumed an independent importance that potentially threaten[ed] to dominate the administrative hearing." (*Id.* at pp. 261–262.) The award of "unlimited general compensatory damages" was neither "necessary to . . . [the commission's] purpose nor merely incidental thereto; its effect, rather, is to shift the remedial focus of the administrative hearing . . . to compensating the injured party not just for the tangible detriment to his or her housing situation, but for the intangible and nonquantifiable injury to his or her psyche suffered as a result of the respondent's unlawful acts, in the manner of a traditional private tort action in a court of law." (*Id.* at p. 264.) However, " '[t]he power to award compensatory and punitive tort damages to an injured

party is a judicial function.' " (*Id.* at p. 262, quoting *Youst v. Longo* (1987) 43 Cal.3d 64, 80 [233 Cal.Rptr. 294, 729 P.2d 728].)

The court explained that, although in *McHugh* it "rejected a rigid rule that would hold administrative agencies incompetent under the doctrine of judicial powers to award 'damages' of any kind [citation], in upholding the administrative award of damages we repeatedly distinguished incidental, 'restitutive' damages—permissible under the judicial powers clause—from the award of unlimited, nonquantifiable compensatory damages." (*Walnut Creek Manor, supra*, 54 Cal.3d at p. 262, quoting *McHugh, supra*, 49 Cal.3d at pp. 358–360, 374–375 & fn. 38.) The court further explained "restitutive damages" are "akin to special damages, i.e., they are quantifiable amounts of money due to an injured private party from another party to compensate for the pecuniary loss directly resulting from the second party's violation of law." (*Walnut Creek Manor*, at p. 263.) "General compensatory damages for emotional distress, by contrast, are not pecuniarily measureable, defy a fixed rule of quantification, and are awarded without proof of pecuniary loss. [Citations.] As the commission itself . . . recognized, in seeking to place a dollar value on a complainant's mental and emotional injuries there is little in legal authority to guide it, for the reason that '[i]t has traditionally been left to the trier of fact to assess the degree of harm suffered and to fix a monetary amount as just compensation therefor. [Citation.]' [Citations.]" (*Ibid.*, quoting *Dept. Fair Empl. & Housing v. Ambylou Enterprises* (1982) No. 82-06, FEHC Precedential Decs. 1982–1983, CEB 3, p. 11.)

The court also pointed out taking on the adjudication of general damages was inconsistent with the commission's purpose to "provide a streamlined and economic procedure for preventing and redressing discrimination in housing as an alternative to the more cumbersome and costly procedure of a civil suit. The availability of alternate civil remedies underscores that the primary regulatory purpose of the act is to *prevent* discrimination in housing before it happens and, when it does occur, to offer a streamlined and economical administrative procedure to make its victim whole in the context of the housing . . . ." (*Walnut Creek Manor, supra*, 54 Cal.3d at p. 264, italics omitted.)

The court accordingly concluded that under the statutory scheme, the commission's award of general compensatory damages for emotional distress violated the judicial powers clause. (*Walnut Creek Manor, supra*, 54 Cal.3d at p. 265.) The court noted it was expressing "no opinion" concerning legislation that authorized the commission to "award nominal or minor general compensatory damages not to exceed a specified maximum amount." (*Id.* at fn. 12.)

The Legislature subsequently amended the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) to make it substantively equivalent to the federal Fair Housing Act (42 U.S.C. § 3601 et seq.), which allows administrative law judges to make emotional distress awards. The amendments to the state law also allowed *either* party to remove the administrative matter to superior court. Accordingly, in *Konig v. Fair Employment & Housing Com.* (2002) 28 Cal.4th 743, 751–758 [123 Cal.Rptr.2d 1, 50 P.3d 718], the court held the new statutory scheme was analogous to mutually agreed-to arbitration, alleviating the judicial powers problem it had identified in *Walnut Creek Manor.*

In *Ocean Park Associates v. Santa Monica Rent Control Bd.* (2004) 114 Cal.App.4th 1050 [8 Cal.Rptr.3d 421] (*Ocean Park Associates*), the Court of Appeal considered a judicial powers challenge to regulations allowing rent reductions for construction activity that significantly impacted habitability, interfered with occupancy, and reduced or removed housing services for more than 24 hours. (*Id.* at pp. 1055–1056.) The regulations enumerated the factors to be considered by the board in acting on "construction [rent reduction] petitions," and also gave a range of percentage rent decreases allowable for some problems (such as noise, odor, dust) and specific dollar reductions for other problems (such as loss of parking space, laundry facilities, or security services). (*Id.* at pp. 1056–1057.) Thus, as the court explained, the regulations permitted "rent decreases based on 'reduced base amenities of a unit,' including loss of parking; laundry facilities; security gates, doors and fencing; recreational facilities; yards; and landscaping, and on lack of maintenance including '[a]ccumulation of garbage, debris or other inappropriate materials in common areas.' [Citation.]" (*Id.* at p. 1069.) Since these services and facilities were used in the first instance "to justify the rent charged," their removal for an extended period of time warranted a commensurate reduction in rent—an action within the permissible purview of the rent board. (*Id.* at pp. 1069–1070.)

We now consider the decrease in housing services provisions of Proposition M. There is no question the Board has a legitimate regulatory purpose of "ensuring enforcement of rent levels." (*McHugh, supra,* 49 Cal.3d at p. 374.) "The Rent Ordinance was adopted in June 1979 in order to address problems created by a shortage of decent, safe and sanitary housing in the City and County of San Francisco." (*Baba, supra,* 124 Cal.App.4th at p. 509.) The stated purpose of the Board is therefore to "safeguard tenants from excessive rent increases and, at the same time, to assure landlords fair and adequate rents . . . ." (§ 37.1, subd. (b)(6).)

Prior to the enactment of Proposition M, the Rent Ordinance provided a tenant could petition the Board for a reduction in rent when "a landlord has

substantially decreased services without a corresponding reduction in rent and/or has failed to perform ordinary repair or maintenance under State or local law and/or has failed to provide the tenant with a clear explanation of current charges for gas and electricity or bond measure costs passed through to the tenant and/or imposed a nonconforming rent increase which is null and void. . . ." (See § 37.8, subd. (b)(2)(A).) As we have discussed, Proposition M expanded the definition of "decreased services" by enumerating 15 prohibited acts of "Tenant Harassment" (set forth in new § 37.10B, subd. (a)), and stating the commission of any of these acts constitutes "a substantial and significant decrease in services as defined in Section 37.2[, subdivision] (g)" for which "tenants may file a petition with the Rent Board for a reduction in rent" (as specified in new § 37.10B, subd. (c)(1)) (underscoring omitted; see § 37.10B, subds. (a), (c)(1)).

The City does not dispute Proposition M authorizes the Board to award "non-restitutive damages." Instead, it asserts a "facial challenge must fail if courts can conceive of a single situation in which the legislative enactment can be constitutionally applied," quoting *Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 138 [122 Cal.Rptr.2d 425] (*Personal Watercraft Coalition*). The City maintains it is possible the Board might award "remedial damages for quantifiable harms" in connection with a section 37.10B rent reduction and therefore the proposition can be applied constitutionally and cannot be ruled facially invalid.

■ The California Supreme Court, however, has not endorsed the *Personal Watercraft Coalition* formulation of the facial challenge rule. Rather, the court has stated a plaintiff must "demonstrate from the face of the ordinance" that the challenged portion will result in legally impermissible outcomes "in the *generality* or *great majority* of cases, the minimum showing we have required for a facial challenge to the constitutionality of a statute." (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 673 [117 Cal.Rptr. 269, 41 P.3d 87] (*San Remo*).) In *County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322 [93 Cal.Rptr.3d 39], the real party in interest insisted, as the City does here, that the court was required to "deny the . . . petition unless no set of circumstances exists under which the law will be valid." (*Id.* at p. 337.) As Division Five of this court explained, this is a "more stringent test than that applied by the California Supreme Court." (*Ibid.*) "Thus, although we may not invalidate a statute simply because in some future hypothetical situation constitutional problems may arise (*Tobe v. City of Santa Ana* [(1995)] 9 Cal.4th [1069,] 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145]), neither may we . . . uphold the law simply because in some hypothetical situation it might lead to a permissible result." (*California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 347 [84 Cal.Rptr. 425, 975 P.2d 622].)

We see a clear distinction between subdivision (a)(1), (2) and (3) of new section 37.10B, and subdivision (a)(4) through (15). Subdivision (a)(1), (2) and (3) prohibit "bad faith" interruption, termination or failure to "provide housing services," and failure to perform maintenance and repairs. (§ 37.10B, subd. (a)(1)–(3).) These are matters which ordinarily would produce a quantifiable, pecuniary loss and, thus, a rent reduction that is "restitutive." (See *Ocean Park Associates, supra*, 114 Cal.App.4th at pp. 1069–1070.) Indeed, such matters are seemingly already within the ambit of the other decrease in services provisions of the Rent Ordinance. (Cf. *Golden Gateway Center v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (1999) 73 Cal.App.4th 1204, 1211–1212 & fn. 7 [87 Cal.Rptr.2d 332] [holding reasonably necessary repair work that temporarily interferes with occupancy does not constitute a decrease in housing services, but noting the court was not considering work carried out in unreasonable manner or over excessive period of time].) Accordingly, subdivision (a)(1), (2) and (3) are not facially invalid under the judicial powers clause.[6]

However, subdivision (a)(4) through (15) of new section 37.10B are of an entirely different character. Virtually any tenant loss compensated through a "rent reduction" under this subdivision will be nonquantifiable and non-restitutive in character. There is no readily measured, quantifiable or pecuniary loss, for example, for "[a]buse the landlord's right of access," influencing or attempting "to influence a tenant to vacate . . . through fraud, intimidation or coercion," attempting "to coerce the tenant to vacate with offer(s) of payments," threatening a tenant with physical harm, violating any antidiscrimination law (race, gender, sexual preference, sexual orientation, ethnic background, nationality, place of birth, immigration or citizenship status, religion, age, parenthood, marriage, pregnancy, disability, or AIDS), interfering with the "right to quiet use and enjoyment," refusing "to accept or acknowledge receipt of a tenant's lawful rent payment" or failing to cash a rent check for 30 days, interfering with a tenant's "right to privacy" (including by requesting citizenship status or Social Security number), or any other "repeated acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of any person lawfully entitled to occupancy of such dwelling unit." (§ 37.10B, subd. (a)(4)–(15).)

On the contrary, the "loss" associated with any of these acts is emotional peace and psychic well-being—in other words general damages, the award of which is " 'a judicial function.' " (*Walnut Creek Manor, supra*, 54 Cal.3d at p. 262.) Moreover, Proposition M set forth no criteria for assessing such losses or translating them into a "reduced rent" figure. (Cf. *Ocean Park Associates, supra*, 114 Cal.App.4th at p. 1056.) Thus, new section 37.10B

---

[6] Appellants have not made, and thus we are not considering, an "as applied" challenge to a rent reduction ordered under this subdivision.

poses the precise risk the Supreme Court identified in *McHugh* "of producing arbitrary, disproportionate results that magnify, beyond acceptable risks, the possibility of arbitrariness inherent in any scheme of administrative adjudication." (*McHugh, supra*, 49 Cal.3d at p. 379.)

That Proposition M impermissibly invested the Board with judicial power is underscored by the fact the measure also provides a tenant or the City can file a superior court action for any of the enumerated acts of "harassment" in new section 37.10B and recover damages therefor. (§ 37.10B, subd. (c)(5).) It is also underscored by the fact the other rent control jurisdictions with tenant "antiharassment" prohibitions similar to those in subdivision (a)(4) through (15) make such conduct actionable in court and compensable through judicially awarded damages. (E.g., Santa Monica Mun. Code, § 4.56.040; West Hollywood Mun. Code, § 17.68.010.) And it is further underscored by the fact similar tenant "antiharassment" legislation, enacted in 2004 and codified as Civil Code section 1940.2, also makes such conduct actionable by way of a civil action. (Civ. Code, § 1940.2, subd. (b).)

The City's hypothetical instances in which the Board could permissibly award "restitutive" damages through a "reduction in rent" under new section 37.10B are a significant stretch and illustrate, as to section 37.10B, subdivision (a)(4) through (15), that such instances are not the "generality or great majority of cases." (*San Remo, supra*, 27 Cal.4th at p. 673, italics omitted.) The City suggests, for example, an owner's failure to cash a rent check within 30 days—one of the actions deemed "harassment" and thereby a "substantial and significant decrease in [housing] services—could result in quantifiable damages because a tenant might suffer overdraft fees if a rent check is not cashed immediately." While overdraft fees may be quantifiable, in the City's example they are not restitutive. Any such overdraft fee would not be a result of the owner's failure to cash the check within 30 days, but the tenant's failure to maintain a balanced checkbook. Furthermore, exploring such personal accounting issues is not reasonably within the Board's charge to "safeguard tenants from excessive rent increases . . . ." (§ 37.1, subd. (b)(6).) The City similarly speculates invasion of a tenant's privacy could result in quantifiable damages because the tenant might hire a lawyer "to cure the harms caused by the landlord's actions." If "curing the harms" took the form of a civil action, an award of attorney fees would be governed by the parameters of that action. If not, investing the Board with the power to determine entitlement to and a reasonable amount of attorney fees incurred in providing unspecified legal services not involving a court action and having *nothing* to do with the cost of housing is so far afield from the Board's purpose to "safeguard tenants from excessive rent increases" it would be a patent exercise of judicial power.

■ We thus conclude the decrease in housing services provisions added to the City's Rent Ordinance by subdivision (a)(4) through (15) of new section 37.10B are an attempt to bypass the judicial system and impermissibly endow the Board with judicial power constitutionally reserved to the judiciary. As such, subdivision (a)(4) through (15) are facially invalid under the judicial powers clause to the extent they empower the Board to order rent reductions.

## B. *Constitutionally Protected Speech*

In the preceding part, we concluded the judicial powers clause precludes the Board from ordering rent reductions under section 37.10B, subdivision (a)(4) through (15). Proposition M also provided this subdivision is enforceable in a civil action. (§ 37.10B, subd. (c)(3).) In addition, any violation of subdivision (a)(4) through (15) is a misdemeanor, punishable by a fine not exceeding $1,000 and six months in the county jail. (§ 37.10B, subd. (c)(2).)

Appellants contend even a court action is foreclosed as to section 37.10B, subdivision (a)(5), (6), and (7) because the provisions impermissibly restrict constitutionally protected speech. Specifically, they claim these three subdivisions are content-based restrictions of ordinary speech which do not survive "strict scrutiny" analysis. Even assuming the provisions are content neutral, appellants alternatively contend the provisions are unconstitutionally vague and overbroad. The City maintains subdivision (a)(5) is a content-neutral, permissible limitation on the manner of speech and subdivision (a)(6) and (7) are restrictions on "commercial speech," which pass muster under "intermediate scrutiny."

■ Freedom of speech is guaranteed under both the United States and California Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 2, subd. (a).) The First Amendment, made applicable to state and local governments by the Fourteenth Amendment, provides in part: "Congress shall make no law . . . abridging the freedom of speech . . . ." (U.S. Const., 1st Amend.) The California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).) "The state Constitution's free speech provision is 'at least as broad' as [citation] and in some ways is broader than [citations] the comparable provision of the federal Constitution's First Amendment." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 958–959 [119 Cal.Rptr.2d 296, 45 P.3d 243]; see *Baba, supra*, 124 Cal.App.4th at p. 513.)

Not all speech, however, is protected by the First Amendment or the liberty of speech clause of the California Constitution. " 'The First Amendment

permits "restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " ' (*Virginia v. Black* (2003) 538 U.S. 343, 358–359 [155 L.Ed.2d 535, 123 S.Ct. 1536].) These categories include defamatory speech, fighting words, incitement to riot or imminent ·lawless action, obscenity and child pornography. (*Bose Corporation v. Consumers Union of United States, Inc.* (1984) 466 U.S. 485, 504 [80 L.Ed.2d 502, 104 S.Ct. 1949].)" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1249 [29 Cal.Rptr.3d 521]; see also *United States v. Stevens* (2010) 559 U.S. ___, ___ [176 L.Ed.2d 435, 130 S.Ct. 1577, 1584] (*Stevens*) [speech restrictions are constitutionally permitted " 'in a few limited areas,' " including obscenity, fraud, incitement, and speech integral to criminal conduct]; *United States v. Williams* (2008) 553 U.S. 285, 297–298 [170 L.Ed.2d 650, 128 S.Ct. 1830] (*Williams*) ["Offers to engage in illegal transactions are categorically excluded from First Amendment protection."].)

In addition to these limited categorical exclusions from First Amendment protection, speech may also be controlled through content-neutral regulations. Such a regulation is subject to review under an "intermediate scrutiny" standard, and will be upheld as a "reasonable time, place, and manner regulation so long as it is (i) narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication." (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 364–365 [93 Cal.Rptr.2d 1, 993 P.2d 334] (*Los Angeles Alliance*); see *Snatchko v. Westfield LLC* (2010) 187 Cal.App.4th 469, 491 [114 Cal.Rptr.3d 368] (*Snatchko*).)

■ "Commercial speech" is subject to greater regulatory control. (See *Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 554 [150 L.Ed.2d 532, 121 S.Ct. 2404] (*Lorillard*); *Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 623 [132 L.Ed.2d 541, 115 S.Ct. 2371] (*Florida Bar*).) " '[C]ommercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.' " (*Board of Trustees, State Univ. of N. Y. v. Fox* (1989) 492 U.S. 469, 477 [106 L.Ed.2d 388, 109 S.Ct. 3028], quoting *Ohralik v. Ohio State Bar Assn.* (1978) 436 U.S. 447, 456 [56 L.Ed.2d 444, 98 S.Ct. 1912].) However, "[w]hile other forms of expression are entitled to more protection under the First Amendment than is commercial speech [citation], the protection provided to commercial speech is nevertheless considerable." (*Pagan v. Fruchey* (6th Cir. 2007) 492 F.3d 766, 770.)

Like ordinary speech, commercial speech that is misleading, fraudulent, or concerns unlawful activity is not protected at all by the First Amendment.

(*Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 563–566 [65 L.Ed.2d 341, 100 S.Ct. 2343] (*Central Hudson*).) In addition, because "regulation of commercial speech based on content is viewed as 'less problematic' [citation] than a content-based regulation of noncommercial speech . . . ," content-based restrictions on "commercial speech" are evaluated under an "intermediate-scrutiny test." (*Baba, supra,* 124 Cal.App.4th at p. 513, quoting *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 65 [77 L.Ed.2d 469, 103 S.Ct. 2875] (*Bolger*).) " 'For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.' "[7] (*Baba,* at pp. 513–514, quoting *Central Hudson,* at p. 566.) This "framework for analyzing regulations of commercial speech . . . is 'substantially similar' to the test for time, place, and manner restrictions" of ordinary speech. (*Lorillard, supra,* 533 U.S. at p. 554.)

With this preliminary overview of the applicable law, we turn to section 37.10B, subdivision (a)(5), (6), and (7).

### 1. *Subdivision (a)(5)*

Section 37.10B, subdivision (a)(5), provides "[n]o landlord, and no agent, contractor, subcontractor or employee of the landlord, shall . . . [in] bad faith . . . [¶] . . . [¶] (5) [i]nfluence or attempt to influence a tenant to vacate a rental housing unit through fraud, intimidation or coercion . . . ." (§ 37.10B, subd. (a)(5).)

Appellants contend section 37.10B, subdivision (a)(5) is a content-based restriction on ordinary speech that cannot survive "strict scrutiny." They further contend even if subdivision (a)(5) is "content neutral," it is unconstitutionally vague and overbroad. The City does not dispute subdivision (a)(5) applies to ordinary speech. It asserts, however, the provision is "content neutral" and a constitutionally permissible regulation of the manner in which a landlord can attempt to influence a tenant to vacate a rental unit.[8]

---

[7] "The Supreme Court has variously described the *Central Hudson* test as having three or four prongs, depending on whether the preliminary inquiry into whether the content to be regulated is protected is counted as a prong. *Compare 44 Liquormart, Inc. v. Rhode Island* [(1996)] 517 U.S. 484, 500[, f]n. 9 [116 S.Ct. 1495, 134 L.Ed.2d 711] . . . (describing the test as having four prongs), *with Florida Bar*[, *supra,*] 515 U.S. 618, 624 . . . (describing the test as having three prongs)." (*Alexander v. Cahill* (2d Cir. 2010) 598 F.3d 79, 88, fn. 5 (*Cahill*).)

[8] The City also contends appellants failed to challenge section 37.10B, subdivision (a)(5) in the trial court and therefore may not challenge the subdivision on appeal. In the trial court, the

■ We begin our analysis by returning to the fundamental principle that speech which is integral to criminal conduct is not constitutionally protected. (See *Stevens, supra,* 559 U.S. at p. ___ [130 S.Ct. at p. 1584]; *Williams, supra,* 553 U.S. at pp. 297–298.) Thus, a regulation prohibiting such speech does not implicate constitutionally protected speech rights and is not subject to any level of constitutional scrutiny. ■ To the extent section 37.10B, subdivision (a)(5) prohibits "[i]nfluenc[ing] . . . a tenant to vacate a rental housing unit *through fraud*" (§ 37.10B, subd. (a)(5), italics added), it prohibits speech integral to unlawful conduct and therefore does not impinge on constitutionally protected speech rights. (See *Cahill, supra,* 598 F.3d at p. 90 [attorney advertisements "that are actually [(as opposed to potentially)] misleading" are "not entitled to First Amendment protection"]; *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 137, fn. 6 [87 Cal.Rptr.2d 132, 980 P.2d 846] ["the First Amendment does not protect an individual's right to commit . . . securities fraud . . . through the use of the spoken word . . ."].)

■ With respect to the remainder of section 37.10B, subdivision (a)(5)—which prohibits "[i]nfluenc[ing] . . . a tenant to vacate a rental housing unit *through . . . intimidation or coercion*" (§ 37.10B, subd. (a)(5), italics added)—we first consider whether it is a content-based or content-neutral restriction on speech. "Deciding whether a particular regulation is content based or content neutral is not always a simple task." (*Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 642 [129 L.Ed.2d 497, 114 S.Ct. 2445].) The Supreme Court's decision in *Los Angeles Alliance,* however, answers the question here—the subdivision is a content-neutral restriction on the manner, not the content, of speech.

■ *Los Angeles Alliance* dealt with a city ordinance prohibiting (a) "aggressive" solicitation to immediately obtain money or other things of value in any locale and (b) all solicitation in certain areas. (*Los Angeles Alliance, supra,* 22 Cal.4th at pp. 363–364.) The plaintiffs argued the ordinance was a content-based prohibition because it applied only to solicitations and thus was a ban based on the content of speech. As the court explained, First Amendment jurisprudence does "*not* require literal or absolute content neutrality, but instead require[s] only that the regulation be 'justified' by legitimate concerns that are unrelated to any 'disagreement with the message' conveyed by the speech." (*Los Angeles Alliance,* at p. 368, quoting *Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d

City argued appellants had not adequately challenged this subdivision in their moving papers. The trial court concluded otherwise, noting appellants specifically listed subdivision (a)(5) in their initial application for a stay. It was therefore apparent to the trial court that appellants were challenging the subdivision even though it was not expressly identified in their points and authorities. Accordingly, at the hearing on appellants' writ petition, the parties addressed the merits of subdivision (a)(5) and the trial court likewise ruled on the merits. The subdivision was, thus, sufficiently raised in the trial court for appellants to challenge it on appeal.

661, 109 S.Ct. 2746].) "[A] regulation will be found content neutral even if it may have disparate incidental effects on speakers based upon message content. As the court explained in *Ward*, '[a] regulation that serves purposes unrelated to the content of the expression' (there, New York City's Central Park sound amplification restrictions designed to avoid undue intrusion into other areas of the park and surrounding neighborhoods) 'is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.' " (*Los Angeles Alliance*, at p. 368; see also *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41, 47–48 [89 L.Ed.2d 29, 106 S.Ct. 925] [ordinance restricting location of adult theatres was aimed not at content of the films but at the secondary effects of such theatres on neighborhoods, and thus was content neutral].) The court concluded the prohibitions on solicitations for immediate donation of money or goods were content neutral because they were justified by public health and safety concerns unrelated to the content of the speech. (*Los Angeles Alliance*, at pp. 368–373.)

We reach the same conclusion as to the remainder of section 37.10B, subdivision (a)(5). It does not restrict all speech attempting to influence a tenant to vacate a rental unit, but only speech that is fraudulent, intimidating, or coercive. The City's interest in prohibiting such fraudulent, intimidating or coercive speech is also justifiable for noncontent reasons, i.e., to prevent the subversion of its Rent Ordinance.

■ Having concluded section 37.10B, subdivision (a)(5) is content neutral, we consider whether it "(i) [is] narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication" and thus is a "reasonable time, place, and manner" restriction on speech. (*Los Angeles Alliance, supra*, 22 Cal.4th at pp. 364–365; see *Snatchko, supra*, 187 Cal.App.4th at p. 491.) We conclude the subdivision meets these criteria. As we have noted, the City has a legitimate interest in preventing conduct that subverts the Rent Ordinance, which includes conduct that threatens or browbeats tenants to vacate so units can be rerented at market rates. (See Civ. Code, § 1940.2, subd. (d) [recognizing "ability of local government to regulate or enforce a prohibition against a landlord's harassment of a tenant"]; *Baba, supra*, 124 Cal.App.4th at p. 509.) The subdivision prohibits only speech that is fraudulent, intimidating, or coercive. It is thus sufficiently tailored to the City's legitimate regulatory purpose and leaves open other avenues of communication.[9]

---

[9] At oral argument, the City conceded a landlord does not violate this subdivision by merely asserting legal rights, e.g., by telling a tenant who has failed to timely pay rent that, unless rent is timely paid, the owner will commence unlawful detainer proceedings. Rather a landlord must act abusively and without legitimate grounds, and for the purpose of subverting the provisions of the Rent Ordinance to violate this subdivision.

■ We similarly conclude section 37.10B, subdivision (a)(5) is not unconstitutionally overbroad. "Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.' *Brockett* v. *Spokane Arcades, Inc.* [(1985)] 472 U.S. 491, 503 [86 L.Ed.2d 394, 105 S.Ct. 2794] . . . . A statute may be invalidated on its face, however, only if the overbreadth is 'substantial.' *Houston* v. *Hill* [(1987) 482 U.S. 451,] 458–459 [96 L.Ed.2d 398, 107 S.Ct. 2502] . . . ." (*Airport Comm'rs v. Jews for Jesus, Inc.* (1987) 482 U.S. 569, 574 [96 L.Ed.2d 500, 107 S.Ct. 2568].) The requirement that the overbreadth be substantial arose from the Supreme Court's "recognition that application of the overbreadth doctrine is, 'manifestly, strong medicine,' *Broadrick* v. *Oklahoma* [(1973) 413 U.S. 601,] 613 [37 L.Ed.2d 830, 93 S.Ct. 2908], and that 'there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.' *City Council of Los Angeles* v. *Taxpayers for Vincent* [(1984)] 466 U.S. 789, 801 [80 L.Ed.2d 772, 104 S.Ct. 2118] . . . ." (*Ibid.*) Subdivision (a)(5) prohibits only speech that is fraudulent, intimidating, or coercive, and does not significantly compromise protected speech.

■ We also conclude the subdivision is not unconstitutionally vague. As we have noted, Proposition M makes a violation of any of the subparts of new section 37.10B, subdivision (a), a criminal offense. (§ 37.10B, subd. (c)(2).) "[C]ourts must take extra care in determining whether criminal statutes are vague or 'reach[] a substantial amount of constitutionally protected conduct' because of the heightened risk of deterring people from engaging in constitutionally protected conduct." (*Maldonado* v. *Morales* (9th Cir. 2009) 556 F.3d 1037, 1045, quoting *Houston* v. *Hill, supra,* 482 U.S. at p. 458.)

"The standard for unconstitutional vagueness is whether the statute 'provide[s] a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.' " (*Maldonado* v. *Morales, supra,* 556 F.3d at p. 1045, quoting *Williams, supra,* 553 U.S. at p. 304.) "A law is unconstitutionally vague if it fails to meet two basic requirements: (1) The regulations must be sufficiently definite to provide fair notice of the conduct proscribed; and (2) the regulations must provide sufficiently definite standards of application to prevent arbitrary and discriminatory enforcement." (*Snatchko, supra,* 187 Cal.App.4th at p. 495; accord, *Chicago* v. *Morales* (1999) 527 U.S. 41, 56 [144 L.Ed.2d 67, 119 S.Ct. 1849].) " 'Only a reasonable degree of certainty is required, however.' (*Tobe* [v. *City of Santa Ana*], *supra,* 9 Cal.4th at p. 1107.) If a

reasonable and practical construction can be given, the law will not be held void for uncertainty." (*Snatchko*, at p. 495.)

Given the specific context of section 37.10B, subdivision (a)(5) and the limited conduct it addresses, we conclude a reasonable person would understand the conduct it prohibits. Indeed, there are many statutory prohibitions similar to those of subdivision (a)(5). (See, e.g., Pen. Code, §§ 31 [all persons "who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals"], 95, subd. (c) [felony to corruptly influence a juror by "[a]ny threat, intimidation, persuasion, or entreaty"], 146a, subd. (a)(2) [unlawful to impersonate law enforcement officer and "intimidate[] any person"], 236.1, subds. (a), (d)(1) [prohibiting human trafficking by depriving the personal liberty of another "through fraud, deceit, coercion, violence, duress, menace, or threat"], 266g [prohibiting enforced prostitution of wife through "force, intimidation, threats, persuasion, promises, or any other means"], 311.4, subd. (b) [anyone who "knowingly promotes, employs, uses, persuades, induces, or coerces a minor" to engage in conduct for sexual exploitation commits a felony], 594.3, subd. (b) [vandalizing place of worship "for the purpose of intimidating and deterring persons" from religious observance is a felony], 602.1, subd. (a) [intentionally interfering with lawful business "by obstructing or intimidating" customers and refusing to leave upon request is a misdemeanor], 686.2 [court can order removal of spectator in court who "is intimidating" a witness], 1387, subd. (a)(2) [terminating criminal proceeding does not bar new prosecution if termination resulted from "direct intimidation of a material witness"], 6129, subd. (a)(2) [prohibited "retaliation" of Department of Corrections and Rehabilitation employee means "intentionally engaging in acts of reprisal, retaliation, threats, coercion, or similar acts"]; see also Lab. Code, §§ 139.45, subd. (b)(4) [prohibiting advertisements transmitted "in any manner that involves coercion, duress, compulsion, intimidation, threats, or vexatious or harassing conduct"], 922 [person who "coerces or compels" any person to enter into an agreement not to join a labor organization commits a misdemeanor].) We therefore conclude there is a social consensus as to the kind of conduct that is "intimidating" or "coercive."

### 2. *Subdivision (a)(6)*

Section 37.10B, subdivision (a)(6), provides "[n]o landlord, and no agent, contractor, subcontractor or employee of the landlord, shall . . . [in] bad faith . . . [¶] . . . [¶] (6) [a]ttempt[] to coerce the tenant to vacate with offer(s) of payments to vacate which are accompanied with threats or intimidation." (§ 37.10B, subd. (a)(6).)

Appellants contend section 37.10B, subdivision (a)(6) is also a content-based restriction on ordinary speech that cannot survive "strict scrutiny," and

even if it is "content neutral," it is unconstitutionally vague and overbroad. The City asserts subdivision (a)(6) regulates "commercial speech" and is constitutional under the "intermediate scrutiny" standard set forth in *Central Hudson, supra*, 447 U.S. 557.

Whether speech is "commercial" and thus afforded lesser constitutional protection can sometimes be a "close[] question." (*Bolger, supra*, 463 U.S. at p. 66; see *Cahill, supra*, 598 F.3d at pp. 88–89 ["In the years since *Bates*[ *v. State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691]], the Supreme Court has offered differing, and not always fully consistent, descriptions as to what constitutes protected commercial speech . . . ."].) The "core notion of commercial speech" is " 'speech which does "no more than propose a commercial transaction." ' [Citation.]" (*Bolger*, at p. 66.) However, the mere fact speech might be considered an advertisement "does not compel" the conclusion it is commercial speech. (*Ibid.*) Similarly, the fact a specific product is referenced "does not by itself" render the communication commercial speech. (*Ibid.*) "Finally, the fact that [the speaker] has an economic motivation" for engaging in the speech "would clearly be insufficient by itself to turn the [communication] into commercial speech." (*Id.* at p. 67.)

It is also notable that the United States Supreme Court's commercial speech decisions have involved the advertising or sale of *products and services*. (E.g., *Lorillard, supra*, 533 U.S. 525 [tobacco advertisements]; *44 Liquormart, Inc. v. Rhode Island, supra*, 517 U.S. at pp. 495–504 [reviewing history of court's commercial speech jurisprudence and considering liquor advertisements]; *Florida Bar, supra*, 515 U.S. 618 [attorney advertising]; *Bolger, supra*, 463 U.S. 60 [contraceptive advertisements]; *Central Hudson, supra*, 447 U.S. 557 [public utility advertisements].)

Appellants and the City both rely on *Baba, supra*, 124 Cal.App.4th 504, to support their respective positions on whether section 37.10B, subdivision (a)(6)—which addresses "offer(s) of payments to vacate" a rental unit—restricts commercial speech. As we have noted, in *Baba*, Division Two of this court invalidated a provision of the Rent Ordinance enacted to prevent threatened Ellis Act evictions to recover and rerent units at market rates. (*Baba*, at pp. 509–510.) The provision made it unlawful for a landlord or anyone assisting a landlord " 'to request that a tenant move from a rental unit or to threaten to recover possession . . . unless . . . [t]he landlord in good faith intends to recover said unit under' " specific subdivisions and within five days of " 'such request' " served the tenant with written notice of the basis of the request. (*Id.* at p. 510.) The court concluded this provision was not directed solely at "core" commercial speech—"it does not regulate speech that does no more than propose a commercial transaction." (*Id.* at

pp. 514–515.) It also concluded the regulated speech did "not relate solely to the economic interests of the speaker and/or his or her audience" because a speaker who "assists" a landlord "may not have any economic interest in the matter at issue at all." (*Id.* at p. 515.) Further, the provision "broadly" referred to "threats" or "requests," without any limitation that they be "motivated by or even related to the economic interests of the parties." (*Ibid.*)

The court in *Baba* also pointed out "[t]he landlord-tenant relationship, though it surely has a commercial component, is more complex, personal and permanent than the relationship between the seller of goods or services and his or her potential buyer." (*Baba, supra,* 124 Cal.App.4th at p. 516.) Appellants seize on this language to support their assertion section 37.10B, subdivision (a)(6) does not restrict commercial speech, since it restricts speech between a landlord and a tenant. The court further observed, however, "[s]ome of the speech prohibited by [the] provision could be construed as commercial speech. For example, a landlord who requests that a tenant vacate a rental unit in exchange for a cash payment would violate this regulation . . . ." (*Baba,* at p. 515.) The City contends this language compels the conclusion subdivision (a)(6) is commercial speech since it prohibits "offer(s) of payments to vacate" a rental unit.

We need not, and do not, decide whether section 37.10B, subdivision (a)(6) restricts "commercial speech," because even viewed as a regulation of private speech (e.g., an offer by one party to a private contract to the other party to terminate the contractual relationship), it is, like subdivision (a)(5), a reasonable "time, place, and manner" restriction. (See also *Lorillard, supra,* 533 U.S. at p. 554 ["framework for analyzing regulations of commercial speech . . . is 'substantially similar' to the test for time, place, and manner restrictions" of ordinary speech].) We similarly conclude subdivision (a)(6) is not unconstitutionally overbroad or vague for the same reasons we so concluded as to subdivision (a)(5).[10]

### 3. *Subdivision (a)(7)*

Section 37.10B, subdivision (a)(7), provides "[n]o landlord, and no agent, contractor, subcontractor or employee of the landlord, shall . . . [in] bad faith . . . [¶] . . . [¶] (7) [c]ontinue to offer payments to vacate after tenant has notified the landlord in writing [that] they no longer wish to receive further offers of payments to vacate." (§ 37.10B, subd. (a)(7).)

Appellants contend section 37.10B, subdivision (a)(7) is also a content-based restriction on ordinary speech that cannot survive "strict scrutiny," and

---

[10] As we noted *ante* at footnote 9, a landlord does not violate this subdivision by legitimately asserting his or her legal rights.

even if it is "content neutral," it is unconstitutionally vague and overbroad. The City asserts subdivision (a)(7) addresses "commercial speech" and passes "intermediate scrutiny" under the standard set forth in *Central Hudson, supra,* 447 U.S. 557.

We have discussed the parties' contentions with respect to commercial speech in the preceding part. We need not, and do not, decide whether section 37.10B, subdivision (a)(7) restricts commercial speech, since we conclude it does not withstand even "intermediate scrutiny" under the standard applicable to commercial speech set forth in *Central Hudson.*

Because the speech in question is neither misleading nor unlawful, and because the City has a substantial interest in ensuring compliance with its Rent Ordinance (*Baba, supra,* 124 Cal.App.4th at p. 519), we address, specifically, the last of the *Central Hudson* inquiries—whether the "limitation on expression . . . [is] designed carefully to achieve the [City's] goal." (*Central Hudson, supra,* 447 U.S. at p. 564.)

■■■ "Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." (*Central Hudson, supra,* 447 U.S. at p. 564; see also *Lorillard, supra,* 533 U.S. at pp. 555–556.) We need not, and do not, decide whether section 37.10B, subdivision (a)(7) meets the first of these two criteria, since we conclude the subdivision does not meet the second.

"The second criterion recognizes that the First Amendment mandates that speech restrictions be 'narrowly drawn.' *In re Primus* [(1978)] 436 U.S. 412, 438 [56 L.Ed.2d 417, 98 S.Ct. 1893, 1908] . . . . The regulatory technique may extend only as far as the interest it serves." (*Central Hudson, supra,* 447 U.S. at p. 565, fn. omitted.) Stated another way, the restriction must be "no more extensive than necessary to further the" government's substantial interest in regulating the commercial speech. (*Id.* at pp. 569–570, 572; see *Lorillard, supra,* 533 U.S. at pp. 555–556.) "The State cannot regulate speech that poses no danger to the asserted state interest, see *First National Bank of Boston* v. *Bellotti*[ (1978) 435 U.S. 765,] 794–795 [55 L.Ed.2d 707, 98 S.Ct. 1407], nor can it completely suppress information when narrower restrictions on expression would serve its interest as well." (*Central Hudson,* at p. 565.)

A restriction that entirely suppresses commercial speech must be reviewed "with special care."[11] (*Central Hudson*, at p. 566, fn. 9.)

Appellants contend section 37.10B, subdivision (a)(7) is a complete prohibition on offers of payments to vacate and therefore must be reviewed with "special care." The City asserts otherwise, pointing out a landlord is prohibited from making such offers only when a tenant provides written notice that he or she no longer wishes to receive them. That the subdivision has a trigger—written notification by a tenant—does not change the fact that any and all forms of communication about offers to vacate are thereafter completely prohibited, apparently until the end of the tenancy (which could be years, or even a decade or more). Accordingly, this subdivision warrants "review with special care." (*Central Hudson, supra*, 447 U.S. at p. 566, fn. 9.)

But even employing a marginally less exacting standard, we conclude the restriction is "more extensive than necessary to further the" City's interest in preventing the subversion of its rent control ordinance and in protecting any reasonable notion of the right to peaceful occupancy. For example, we cannot fathom how an offer of payment to vacate made six months after a tenant has declined such an offer either undercuts the Rent Ordinance or impinges upon a reasonable understanding of the right to peaceful occupancy. Indeed, if general economic conditions, or a tenant's personal economic circumstances, were to change after an initial offer to vacate, the tenant might be interested in a new offer. Yet such an offer is absolutely prohibited by section 37.10B, subdivision (a)(7).

*Florida Bar, supra*, 515 U.S. 618, is illuminating in this regard. In that case, a lawyer and lawyer referral service challenged a state bar rule prohibiting lawyers from using direct mail to solicit personal injury or wrongful death clients within 30 days of the accident giving rise to the potential claim. (*Id.* at pp. 620–621.) The rule was adopted after hearings, surveys and public commentary, and intended to "forestall the outrage and irritation with the state-licensed legal profession that the practice of direct solicitation only days after accidents has engendered" and to curb activities that " 'negatively affect[ed] the administration of justice.' " (*Id.* at pp. 631, 624.) The Supreme Court concluded the "30-day blackout period" on direct solicitations satisfied *Central Hudson* since the court did "not see 'numerous

---

[11] We recognize this is not a " 'least restrictive means' " test. (*Lorillard, supra*, 533 U.S. at p. 556.) Nonetheless, there must be a "reasonable ' "fit between the [government's] ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective." ' [Citation.]" (*Ibid.*; accord, *Baba, supra*, 124 Cal.App.4th at p. 520.) This is a standard more rigorous than "rational basis" review. (*Florida Bar, supra*, 515 U.S. at p. 632.)

and obvious less-burdensome alternatives' " that would fulfill the state bar's legitimate objectives. (*Florida Bar*, at pp. 620, 633.) It observed, however, there might well be a constitutional problem if the rule "were not limited to a brief period and if there were not many other ways for injured [citizens] to learn about the availability of legal representation during that time." (*Id.* at p. 633.) Section 37.10B, subdivision (a)(7)'s prohibition on offers of payments to vacate has *no* temporal limitation and bans *all* forms of communication and, thus, is the antithesis of the narrow restriction upheld in *Florida Bar*.

*Pearson v. Edgar* (7th Cir. 1998) 153 F.3d 397 (*Pearson*), is also instructive. In that case, real estate brokers challenged a statute restricting residential solicitations. The statute prohibited any solicitation to sell or list a residential property after the owner gave notice in the manner specified in the statute that he or she did not desire to sell. (*Id.* at p. 399.) The court of appeals recognized the importance of the state's significant interest in protecting residential privacy. (*Id.* at pp. 402–403.) However, the court concluded a prohibition against solicitation only by real estate brokers was not a "reasonable fit" to accomplish that interest. (*Id.* at pp. 403–405.) As the court observed, the specific prohibition against solicitation to list or sell residential properties was such a severely "underinclusive" means for the state to achieve its stated interest in residential privacy, the lack of congruence indicated "a lack of reasonable fit." (*Id.* at p. 404.) This analysis applies equally here to the City's assertion that section 37.10B, subdivision (a)(7) serves its interest in protecting the residential privacy interests of its citizenry.

In defense of section 37.10B, subdivision (a)(7), the City relies on the "do-not-call" and mail list cases, principally citing *Mainstream Marketing Services, Inc. v. Federal Trade Commission* (10th Cir. 2004) 358 F.3d 1228 (*Mainstream Marketing*). In *Mainstream Marketing*, the circuit court of appeals upheld the do-not-call registry established by regulations promulgated by the Federal Trade Commission and the Federal Communications Commission. During the course of enacting legislation to prevent telemarketing abuse, Congress had found consumers lose an estimated $40 billion each year due to telemarketing fraud. (*Id.* at p. 1235.) And by telemarketers' own estimates, they made billions of calls each year. (*Id.* at p. 1240.)

There are significant differences between the do-not-call registry upheld in *Mainstream Marketing* and section 37.10B, subdivision (a)(7). To begin with, the do-not-call registry is aimed at certain nameless and faceless telemarketers who make impersonal sales pitches to whoever happens to fit the demographic they are targeting. The landlord-tenant relationship is significantly different. The parties have a preexisting and ongoing relationship which "surely has a commercial component," but also is "more complex,

personal and permanent than the relationship between the seller of goods or services and his or her potential buyer." (*Baba, supra,* 124 Cal.App.4th at p. 516.) In addition, the federal regulations prohibit only telephone solicitations. They "do not hinder any business' ability to contact consumers by other means, such as direct through mailings." (*Mainstreet Marketing, supra,* 358 F.3d at pp. 1233, 1243.) Subdivision (a)(7), however, prohibits any and all forms of communication by a landlord about a monetary offer to vacate. Further, the do-not-call registry remains valid for five years. (*Mainstreet Marketing,* at p. 1235.) Subdivision (a)(7) has no temporal limitation on the prohibition against monetary offers to vacate.

 Accordingly, while the circuit court in *Mainstreet Marketing, supra,* 358 F.3d at page 1245, concluded the do-not-call registry "is narrowly tailored to restrict only speech that contributes to the problems the government seeks to redress, namely the intrusion into personal privacy and the risk of fraud and abuse" caused by telemarketing, we cannot reach a similar conclusion as to section 37.10B, subdivision (a)(7)'s absolute, unlimited prohibition against all forms of communication about monetary offers to vacate. As we observed above, the asserted purpose of subdivision (a)(7) is to prevent subversion of the Rent Ordinance and secure tenants' right to peaceful occupancy—purposes that are indisputably legitimate and important. However, an absolute and unlimited proscription on any and all forms of communication is not a tailored approach in any respect, and certainly is not tailored so as to be "no more extensive than necessary" to achieve the City's substantial interests. (*Central Hudson, supra,* 447 U.S. at pp. 569–570, 572; see *Lorillard, supra,* 533 U.S. at pp. 561–566; *Pearson, supra,* 153 F.3d at pp. 403–405.)

The City points out that in upholding the do-not-call registry, the court of appeals emphasized that "speech restrictions based on private choice (i.e.,—an opt-in feature) are less restrictive than laws that prohibit speech directly." (*Mainstreet Marketing, supra,* 358 F.3d at pp. 1242–1244.) This principle emerged in the context of unsolicited marketing and sales efforts. (See *Rowan v. Post Office Dept.* (1970) 397 U.S. 728 [25 L.Ed.2d 736, 90 S.Ct. 1484] [upholding federal law under which individual could require mailer to stop future mailings if he or she received advertisements that he or she believed to be erotically arousing or sexually provocative]; see also *Schaumburg v. Citizens for Better Environ.* (1980) 444 U.S. 620, 639 [63 L.Ed.2d 73, 100 S.Ct. 826] [concluding certain provisions of antisolicitation and peddling ordinance were not narrowly drawn, and noting other, nonchallenged provisions permitted citizens to post a sign reading " 'No Solicitors or Peddlers Invited' "].) As we have discussed, the landlord-tenant relationship is significantly different.

Further, that section 37.10B, subdivision (a)(7) authorizes a tenant to "opt out" of any further communications about monetary offers to vacate, in any form, does not eliminate the final inquiry mandated by *Central Hudson*— whether the restriction is "no more extensive than necessary to further the" government's interest. In *Mainstreet Marketing*, for example, the court of appeals also pointed out the do-not-call registry is limited to telemarketing (in fact, to specific telemarketers), there are other means to advertise the telemarketed products, and the registry is of limited duration. (*Mainstreet Marketing, supra*, 358 F.3d at pp. 1234–1235, 1243; see also *Pearson, supra*, 153 F.3d at pp. 403–405 [even where state's interest was protecting residential privacy, court had to consider *Central Hudson*'s "narrowly tailored" requirement].) Indeed, the parties have not cited a single case involving, let alone approving, a situation wherein it is only through governmental regulation that a citizen can prohibit any and all forms of communication, in any forum, for an unlimited period of time—thus, wholly silencing the speaker and doing so permanently.

We therefore conclude section 37.10B, subdivision (a)(7), even assuming it restricts "commercial speech," does not survive "intermediate" scrutiny under *Central Hudson* and cannot be enforced.[12]

## C. *Attorney Fees Provision*

The City contends the trial court erred in invalidating on equal protection grounds the attorney fees provision Proposition M added to the Rent Ordinance. This provision states: "In any action to recover possession of a rental unit subject to the Chapter, unless the sole basis of the notice to quit is

---

[12] We are aware that in a federal court case brought by different plaintiffs, the district court ruled in an unpublished order that section 37.10B, subdivision (a)(7) permissibly restricts commercial speech. (*Carrico v. City and County of San Francisco* (N.D.Cal., Sept. 4, 2009, No. C09-00605 WHA) 2009 WL 2901593, pp. *5–*7.) We grant appellants' February 8, 2011, request for judicial notice of four pleadings filed in that case. (Evid. Code, § 452, subd. (d)(1).) The district court relied on the principle that nothing in the Constitution compels " 'us to listen to or view any unwanted communication' " and stated it is "unlikely" any landlord-tenant communications will occur "outside of the home." (*Id.* at pp. *4–*5.) The court thus concluded subdivision (a)(7)'s prohibition "does not burden any speech beyond that which is necessary to protect the privacy interests of the tenant." (*Carrico*, at p. *5.) There is nothing in the record before us that supports the statement all landlord-tenant communications prohibited by subdivision (a)(7) would be "in the home." Furthermore, the fact privacy interests are "substantial" under the *first* of *Central Hudson*'s inquiries and can thus support the regulation of speech, does not end the analysis or dispense with the *last* inquiry as to whether the restriction is narrowly tailored to achieve that interest. (See *Mainstreet Marketing, supra*, 358 F.3d at pp. 1238, 1242; *Pearson, supra*, 153 F.3d at pp. 403–405.) Finally, the specific regulatory purposes of subdivision (a)(7) are to prevent landlords from subverting rent controls and to protect tenants' right to peaceful occupancy—neither of which requires an absolute prohibition on all forms of communication, in any locale, for all time.

Section 37.9[, subdivision] (b),[13] the court shall award the tenant reasonable attorney fees and costs incurred in defending the action upon a finding that the tenant is the prevailing party under Code of Civil Procedure section 1032[, subdivision] (a)(4)." (§ 37.10B, subd. (c)(6).) The City acknowledges this new provision of the municipal code requires an award of attorney fees to a prevailing tenant in an unlawful detainer case brought under state law. (Code Civ. Proc., § 1161 et seq.) We requested additional briefing on whether the City has authority to effectively add, by local ordinance, an attorney fees provision to the state unlawful detainer statutes. We conclude the City has no such authority and invalidate the fee provision.

 Unlawful detainer actions are authorized and governed by state statute. (Code Civ. Proc., § 1161 et seq.) The statutory scheme is intended and designed to provide an expeditious remedy for the recovery of possession of real property. (*Birkenfield v. City of Berkeley* (1976) 17 Cal.3d 129, 151 [130 Cal.Rptr. 465, 550 P.2d 1001] (*Birkenfield*).) Unlawful detainer actions are, accordingly, of limited scope, generally dealing only with the issue of right to possession and not other claims between the parties, even if related to the property. (See *ibid.*) Damages are commensurately limited to those incurred because of wrongful possession. (Code Civ. Proc., § 1174, subd. (b).) Nevertheless, unlawful detainer proceedings are procedurally technical, with stringent service and notice requirements, and stringent procedural deadlines. (E.g., Code Civ. Proc., §§ 1166, 1167, 1167.3–1167.5, 1170.5, 1174, subds. (a), (c).)

The statutory scheme expressly addresses attorney fees in two contexts. The first is when a "habitability" claim is raised. Code of Civil Procedure section 1174.2 provides that a tenant may raise a "habitability" defense to an unlawful detainer action. (Code Civ. Proc., § 1174.2, subd. (a) [tenant can raise as affirmative defense "a breach of the landlord's obligations under Section 1941 of the Civil Code[14] or of any warranty of habitability"]; see also Civ. Code, §§ 1942.3 [providing for a rebuttable presumption of inhabitability in unlawful detainer actions when specified showing is made], 1942.4 [prohibiting issuance of three-day notice required for eviction action where specified inhabitability problems exist].) The "prevailing party" on a habitability claim asserted under Civil Code section 1942.4 is "entitled to recovery of reasonable attorney's fees and costs of the suit in an amount fixed by the court." (Civ. Code, § 1942.4, subd. (b)(2).) If the court determines there has been "no substantial breach of Section 1941 of the Civil Code or of any

---

[13] Section 37.9, subdivision (b) provides in part: "A landlord who resides in the same rental unit with his or her tenant may evict said tenant without just cause . . . ." (§ 37.9, subd. (b).)

[14] Civil Code section 1941 provides in pertinent part: "The lessor of a building intended for the occupation of human beings must . . . put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof, which render it untenantable . . . ." (Civ. Code, § 1941.)

warranty of habitability" the "landlord shall be the prevailing party for the purposes of awarding costs or attorneys' fees pursuant to any statute or the contract of the parties." (Code Civ. Proc., § 1174.2, subd. (b).)

The second context in which the unlawful detainer statutes address attorney fees is when a claim of retaliatory eviction is raised. Code of Civil Procedure section 1174.21 provides that if a landlord institutes an unlawful detainer action for failure to pay rent, but is found to have violated the antiretaliatory eviction provisions of Civil Code section 1942.4, the landlord "shall be liable to the tenant" for "reasonable attorneys' fees and costs of the suit, in an amount to be fixed by the court." (Code Civ. Proc., § 1174.21.)

█ Thus, when the Legislature has determined an award of attorney fees is appropriate in an unlawful detainer case, it has provided for such. It has done so in two specific contexts—where a habitability defense is raised (Code Civ. Proc., § 1174.2, subd. (b); Civ. Code, § 1942.4, subd. (b)(2)) and where a tenant prevails on a claim of retaliatory eviction (Code Civ. Proc., § 1174.2). That the Legislature has not otherwise provided for attorney fees in unlawful detainer cases indicates it does not intend that ordinary unlawful detainer proceedings be burdened with such a mandate. █ (See *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1118 [29 Cal.Rptr.3d 262, 112 P.3d 647] [" ' "[W]hen the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded." ' "]; *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 725 [257 Cal.Rptr. 708, 771 P.2d 406], quoting *Ford Motor Co. v. County of Tulare* (1983) 145 Cal.App.3d 688, 691 [193 Cal.Rptr. 511]; *Yoo v. Shewry* (2010) 186 Cal.App.4th 131, 146 [111 Cal.Rptr.3d 322] [same].)

█ The lack of any other statutory provision for attorney fees in unlawful detainer proceedings is consistent with their summary nature. It is also consistent with the fact tenancies are a matter of contract, and the parties can choose whether or not to include an attorney fees provision in their agreement, and often do (in which case fee reciprocity is ensured by Civ. Code, § 1717).

█ Municipalities clearly have authority to impose *substantive* limitations on the grounds for evictions. (*Birkenfield, supra*, 17 Cal.3d at pp. 147–150.) As the Supreme Court explained in *Birkenfield*, this authority is grounded in "the police power to impose reasonable regulations upon private property rights to serve the larger public good." (*Id.* at p. 146.) The "elimination of particular grounds for eviction is a limitation upon the landlord's property rights under the police power, giving rise to a substantive ground of defense in unlawful detainer proceedings." (*Id.* at p. 149.)

Such substantive limitations on property rights are not in conflict with the unlawful detainer statutes because "[t]he purpose of the unlawful detainer statutes is procedural. The statutes implement the landlord's property rights by permitting him to recover possession once the consensual basis for the tenant's occupancy is at an end." (*Birkenfield, supra*, 17 Cal.3d at p. 149.) The "statutory remedies for recovery of possession . . . do not preclude a defense based on municipal rent control legislation enacted pursuant to the police power imposing rent ceilings and limiting the grounds for eviction for the purpose of enforcing those rent ceilings." (*Ibid.*)

Locally imposed *procedural* constraints on the state statutory scheme are, however, in excess of a municipality's police power to regulate the substantive contours of private property rights and an intrusion upon the state legislative scheme to provide a "summary repossession procedure . . . intended to be a relatively simple and speedy remedy that obviates any need for self-help by landlords." (*Birkenfield, supra*, 17 Cal.3d at p. 151, citations omitted.)

██ Proposition M's mandatory, one-sided attorney fees provision is not a substantive limitation on private property rights that gives rise to an affirmative defense to an unlawful detainer action, i.e., it is not permissible under the City's reserved police powers to regulate private property rights for the greater public good. Such substantive limitations on private property rights are set forth in *other* provisions of the Rent Ordinance. (See, e.g., § 37.9, subds. (i), (j).)

There is also a startling lack of congruence between the asserted purpose of Proposition M—to ensure that owners do not "harass" tenants or otherwise abuse their rights under the Costa-Hawkins Act—and the sweep of the attorney fees provision. The fee provision mandates an award of attorney fees to a prevailing tenant in *any* unlawful detainer proceeding. Yet, because of the highly technical notice, service and timing requirements set forth in the unlawful detainer statutes, cases can be, and often are, dismissed for procedural reasons that have nothing to do with tenant "harassment." Settlements are also strongly encouraged, sometimes resulting in dismissal of the case. In any of these instances, the tenant would be the "prevailing party" under Code of Civil Procedure section 1032, subdivision (a)(4), and Proposition M would compel a fee award—even though the owner engaged in no "bad faith" conduct, and indeed, may even have worked with the tenant to avoid an eviction. To paraphrase *Bullard*, Proposition M's fee provision is "a remarkably blunt instrument" to effectuate the measure's asserted purpose of punishing bad faith efforts to dislodge tenants to raise rents to market rates. (*Bullard, supra*, 106 Cal.App.4th at p. 491.)

In *People ex rel. City of Santa Monica v. Gabriel* (2010) 186 Cal.App.4th 882 [112 Cal.Rptr.3d 574] (*Gabriel*), the Court of Appeal reversed an award of attorney fees in a case brought under the unfair competition laws (UCL; Bus. & Prof. Code, § 17200 et seq.). Acknowledging that section 17200, itself, does not provide for attorney fees, the city argued the court could look to its local rent ordinance, which prohibited the conduct at issue (sexual harassment of a tenant, unlawful entry and renting a utility closet as living quarters) and provided for attorney fees. (*Gabriel*, at p. 889.) The Court of Appeal declined to do so, pointing out the UCL is a state statute, has no fee provision, was designed to provide a streamlined procedure, and provides for limited remedies. (186 Cal.App.4th at pp. 889–891.) The court contrasted cases in which claims are brought not only under the UCL, but also under other statutes or local laws that provide for attorney fees. If the plaintiff prevails on the latter claims, then fees can properly be awarded on the basis of those laws. However, where a plaintiff sues only under the UCL, no fee award is proper given the absence of a fee provision in the statute. (186 Cal.App.4th at pp. 890–891.)

■ The analysis in *Gabriel* is apposite here. The unlawful detainer statutes provide for summary proceedings, with limited remedies. And not only is there no provision for attorney fees in ordinary unlawful detainer proceedings, but the Legislature has expressly provided for fees in only two limited instances, where habitability and retaliatory eviction claims are at issue. Thus, similarly to the Court of Appeal in *Gabriel*, we conclude the City cannot, by local ordinance, effectively amend the state unlawful detainer statutes to add a mandatory, one-sided attorney fees provision.

The City has cited no case in which any court has suggested, much less held, that a municipality, by local ordinance, can mandate an award of attorney fees to successful tenants in unlawful detainer cases. In *Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741 [90 Cal.Rptr.3d 181], Division Three of this court upheld a provision in Oakland's rent control ordinance that provided for attorney fees in *wrongful eviction* actions, authorized by and brought pursuant to the ordinance *after* a tenant defeated an unlawful detainer case. (*Id.* at pp. 750, 760–761.) The appellants in that case argued Code of Civil Procedure section 1021 authorizes a fee award only when fees are allowed by "statute" and the rent control ordinance did not qualify as such. (*Rental Housing Assn.*, at pp. 760–761.) As the court pointed out, it is well established that a city ordinance may authorize attorney fees in an action brought *under the provisions of the ordinance*, and the reference to "statute" in section 1021 is broad enough to include such ordinances. However, an action authorized by and brought pursuant to a local ordinance with a fee provision, as in *Rental Housing Assn.*, is an entirely different proposition than a lawsuit that is

authorized by and brought under a state statute which does not provide for an award of attorney fees, such as an ordinary unlawful detainer proceeding.

We therefore invalidate Proposition M's attorney fees provision, set forth in section 37.10B, subdivision (c)(6), mandating an award of attorney fees to prevailing tenants in unlawful detainer actions.

## CONCLUSION

The judgment is reversed, in part, and affirmed, in part. The judicial powers clause precludes the Board from making rent reductions under section 37.10B, subdivision (a)(4) through (15). Section 37.10B, subdivision (a)(7), is invalid in its entirety because, even assuming it restricts commercial speech, it does not survive "intermediate scrutiny" under *Central Hudson* and unconstitutionally infringes First Amendment speech rights. Section 37.10B, subdivision (c)(6), is invalid in its entirety because the City has no authority to mandate that attorney fees be awarded in unlawful detainer cases brought under state law. The trial court is therefore directed to grant appellants' writ petition, in part, and to issue a writ of mandate consistent with this opinion, and likewise to enter judgment consistent with this opinion as in appellants' declaratory judgment action. The parties shall bear their own costs on appeal.

Marchiano, P. J., and Margulies, J., concurred.